COOK, Justice.
Jefferson County appeals from a judgment entered on a jury verdict in favor of Mavis Thompson in the amount of $45,000. We reverse and remand.
This dispute began when Stanley Thompson, a Jefferson County employee suffering from health problems, requested, and was granted, an unpaid leave of absence effective November 2, 1993.[1] His last day of active employment was October 27, 1993. As of that date, Thompson’s life was insured by GroupAmeriea Insurance Company under a group policy administered by Jefferson County as an employ *139 ment benefit. The policy provided benefits under (1) a “basic, noncontributory” plan (“basic plan”), and (2) a voluntary, supplemental, “contributory” plan (“contributory plan”).
The County paid the premiums for the basic plan. Payments for the contributory plan were $3.83, deducted semimonthly from Thompson’s paycheck and paid by the County to GroupAmerica. These payments were to provide coverage on Thompson’s life (1) under the basic plan in the amount of $39,000, and (2) under the contributory plan in the amount of $85,000.
Coincident with Thompson’s unpaid leave of absence, his paychecks, and, therefore, his deductions, stopped. However, in connection with his leave of absence, Thompson executed a “REQUEST FOR LEAVE OF ABSENCE” form, which included the following provision: “To insure the continuation of health, dental and other insurance coverage, I must contact the Hospital Personnel Office immediately to make arrangements for advance payment of insurance premiums.”
Thompson never returned to work. He died on April 2, 1994. His widow, Mavis Thompson, filed a claim for life insurance benefits under his group policy. Group-America paid the $39,000 under the basic plan. However, it refused to pay the $85,000 contributory-plan benefits, on the ground that Thompson had not paid the premiums after he went on leave, and, therefore, had allowed that coverage to lapse.
On July 12, 1994, Mrs. Thompson addressed a letter to the Jefferson County Personnel Department, attaching a check payable to Jefferson County in the amount of $50.00 as an offer of payment of the unpaid premiums. On October 22, 1994, she addressed a similar letter and offer of payment to GroupAmerica. Her checks were returned uncashed.
On April 2, 1996, Mavis Thompson, individually and as administratrix of the estate of Stanley Thompson, deceased, sued Jefferson County on a breach-of-contract theory. She alleged that the County “at some point in time and without notice, did stop sending in life insurance premiums for the [contributory] policy.” She also made a claim against the County based on a breach-of-fiduciary-duty theory and made claims against GroupAmerica based on various theories.
The cause proceeded to trial. At the close of the plaintiffs evidence, and again at the close of all the evidence, the County moved for a judgment as a matter of law. The court denied those motions. At some point before the jury retired to deliberate, the plaintiff settled her claims against GroupAmerica for $40,000. The jury was informed of this settlement. The jury returned a verdict in favor of the plaintiff against the County for $45,000. The trial court denied the County’s “renewed motion for judgment as a matter of law, or in the alternative, motion for a new trial.” The County appealed.
The resolution of this case turns on two questions: (1) After Stanley Thompson went on leave, did the County owe a duty to pay the premiums for the contributory plan or affirmatively to collect the premium payments from Thompson? (2) Did the plaintiff present substantial evidence indicating that Stanley Thompson paid the premiums due under the contributory plan? We answer both questions in the negative.

I. Duty

The existence of a duty is a question of law to be decided by the court. State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1998).
“An employer policyholder of a group health and accident plan .... does not, by reason of the peculiar position in which it is placed, become a guarantor of the payment of the insurance, nor an insurer.” 1 Eric Holmes & Mark Rhodes, Holmes’s Appleman on Insurance § 2.6, at 266-67 (2d ed.1996).
*140 Group Policy Number 908044-A, under which Thompson was insured, contained the following definitions:
“Your Basic Life Insurance is Noncontributory. Your Additional Life Insurance is Contributory.
[[Image here]]
“LIFE INSURANCE means your life insurance under the Group Policy and includes your Basic Life Insurance and your Additional Life Insurance.
[[Image here]]
“CONTRIBUTORY Insurance means you pay all or a part of the cost of your Insurance. If your Insurance is Contributory, the Employer determines the amount of your contribution toward the cost of your Insurance.
“NONCONTRIBUTORY Insurance means the Employer pays the entire cost of your Insurance.”
(Emphasis added.) It also provided:
“Your insurance will end automatically on the earliest of the following dates:
[[Image here]]
“4. The last day of the last period for lohich you make the required premium contribution for your Insurance, if you contribute toward the cost of your Insurance.”
(Emphasis added.)
It is undisputed that Stanley Thompson authorized payroll deductions for the contributory-plan premium payments and that those deductions were regularly made from his paychecks. Moreover, by signing the “REQUEST FOR LEAVE OF ABSENCE” form, Thompson acknowledged his duty to keep up the premium payments on the contributory plan by means other than payroll deductions.
Thus, Stanley Thompson knew the County had not assumed the duty to pay his contributory-plan premiums, either while he was actively employed or while he was on an unpaid leave of absence. He was on notice that continued coverage depended on his making arrangements to pay the premiums during his unpaid leave. The County, therefore, had no duty to pay Thompson’s premiums for the contributory plan and had no duty to collect premium payments from him after he went on unpaid leave.

II. Sufficiency of the Evidence

The plaintiff concedes that her proof that Thompson paid the premiums turns on a “claim form” that was “signed and certified as being true and correct,” by Rosina Shack, a clerk in the Jefferson County Risk Management Office. Brief of Appellee, at 4. She refers to a claim form that Shack filed with GroupAmerica at the plaintiffs request; that form sought benefits under the County’s group policy. The form was dated April 18, 1994. Question 6 asked: “Amount of Life Insurance Being Claimed: [Answer:] $39,0000.00 Basic $85,000.00 Vol.” Question 12 asked: “Was insurance in force at date of death? [Answer:] Yes.” The plaintiff contends that these answers show that Thompson had made all the necessary payments, but that the County “lost, misplaced, or plainly [failed to pay] GroupAmerica” the premiums due under the contributory plan. Brief of Appellee, at 15. Moreover, the plaintiff concedes that this evidence is the “very essence of this case.” Id. Unfortunately for the plaintiff, Shack’s testimony in regard to the claim form does not support the plaintiffs contention.
Shack testified as follows:
“Q. [By plaintiffs counsel] And you had an opportunity in 1994 to meet Ms. Thompson; is that correct?
“A. [By Rosina Shack] I really don’t know when I met her. I’m sorry, but I don’t remember.
“Q. But would it be a true statement that if one was going to make a benefit claim like Ms. Thompson that you would require her to get documentation, such as a death certificate, things like that?
*141 ‘A. That’s correct.
‘Q. What else would you need?
A. Proof of death. I would need to know who she was, so I would need some identification from her. I can’t remember — it’s been so long — what everything I would need. But I would need a death certificate in order to process the claim.
‘Q. And you would fill out the claim?
A. I would fill out the claims; that is correct.
‘Q. And in filling out those forms, you would do whatever you deemed necessary to determine if premiums were paid on those insurance policies; isn’t that correct?
A. Okay. If we’re talking about the basic benefits, I would, because that’s what I did. I handled the basic.
‘Q. And then you would ask other people about the voluntary; is that correct?
A. Yes.
‘Q. And when you felt comfortable about the fact that they were paid, you would acknowledge that; is that correct?
A. No, sir. Because I don’t knoiu tuhen — I don’t deal with the voluntary. So the basic, I knoiu it’s paid because the County pays that portion. I really — I did not handle the voluntary benefits, so I don’t knoiu if its paid or not.
:‘Q. Now, Ms. Shack, you would check the enrollment card, is that correct, to see if he’s enrolled?
1 A. For the basic, yes, sir.
:‘Q. And you would also check to see if all the benefits are available; is that correct?
; A. I don’t understand the question.
;‘Q. Do you remember a deposition that we had back in October of 1997?
“A. I remember, yes, that we did one.
[[Image here]]
‘Q. Do you remember me asking you this question? And I’ll read this question to you, and if you could answer the response....
A. Yes.
‘Q. ‘So, if somebody had an additional life claim, you would fill that out as well? ... ’
A. T would fill it out.’
‘Q. ‘And would you check all the things necessary for additional life to see if there’s an enrollment card and if premiums are paid?’
A. And I answered, Yes.’
[[Image here]]
‘Q. Okay. Now, this is the claim form that was filled out. Do you recall this claim form?
A. Yes.
[[Image here]]
‘Q. And on this claim form — you sent this to GroupAmerica; is that correct?
A. Uh-huh.
‘Q. And there’s a claim ... here for $39,000 and $85,000; is that correct?
A. Uh-huh.
[[Image here]]
:‘Q. And you would fill this out after checking any sources you needed; is that correct?
A. Basic.
:‘Q. Okay. And voluntary — didn’t you ask Ms. Amason a lot of times on voluntary, if the payments were made?
A. That’s correct.
“Q. Okay. And so you could have asked her if premiums were paid. And if she said yes, then you would acknowledge that on these forms; is that correct?
“A. That is correct.
:Q. And if you needed to, you could call Cooper Green [Hospital] or *142 payroll or anybody else to see if premiums had been collected; is that correct?
“A. I didn’t do it.
“Q. You could have, though, couldn’t you.
“A. But I didn’t do it.
“Q. Now, Ms. Amason had that ability;
is that correct?
“A. I don’t know.
“Q. Okay. But you would check with her or any other source necessary to make sure voluntary life was paid; is that correct?
“A. No.
“Q. But when you made a voluntary-life claim form, you would make sure the premiums were paid, right?
“A. No.
“Q. You would not make — who made the voluntary claim form?
“A. We had one form. Everything was on there. The $39,000 was the basic. I knew that was paid. As far as the dates on the voluntary, whether they were up to date as far as payment, I didn’t know that. “Q. Well, but you could ask — you would have asked around?
“A. Not [to see] if they were up to date, because that wasn’t the point. We were filing a claim.”
(Reporter’s Transcript, at 522-29.) (Emphasis added.)
A motion for a judgment as a matter of law “is proper if the nonmoving party has not presented substantial evidence regarding some element essential to the claim or if there is no disputed issue of fact upon which reasonable persons could differ.” Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1252 (Ala.1998). Shack testified unequivocally that she had no knoiol-edge of whether Stanley Thompson had been paying premiums on the contributory plan. Thus, the fact that the claim form Shack filled out stated that “insurance [was] in force at date of death” did not constitute substantial evidence indicating that the County had received, and then had “lost or misplaced,” Thompson’s payments.[2] Thus, the jury did not have before it substantial evidence indicating that Thompson — during his unpaid leave of absence — paid the premiums on his contributory plan to, or through, the County.[3]

Conclusion

The trial court erred in denying the County’s motion for a judgment as a matter of law. The judgment is, therefore, reversed and this cause is remanded for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, LYONS, and JOHNSTONE, JJ., concur.

. Thompson worked for Jefferson County as an "eligibility clerk” at Cooper Green Hospital.

. In fact, the record contains no evidence indicating that Stanley Thompson ever communicated to the County that he desired to continue his supplemental life insurance. Significantly, there was testimony indicating that Thompson did — during his unpaid leave of absence — continue making premium payments on an accidental death and dismemberment policy.

. Also, the plaintiff conceded that she had no specific knowledge of any payments made by Stanley Thompson on the contributory-plan premiums during his leave of absence. In this connection, she testified only that “[a]s far as [she knew], he paid it because he told [her] he had coverage.”