814 So.2d 203 (2001)
BellSOUTH MOBILITY, INC.
v.
CELLULINK, INC.
Cellulink, Inc., and Eugene Ogletree
v.
BellSouth Mobility, Inc., and BellSouth Cellular National Marketing, Inc.
1990082 and 1990224.
Supreme Court of Alabama.
May 25, 2001.
Rehearing Denied September 7, 2001.
*205 D. Owen Blake, Jr., general counsel, BellSouth Telecommunications, Inc., Birmingham; *206 and John D. Clements, F.A. Flowers III, James E. Fleenor, Jr., and Rebecca W. Block of Burr & Forman, L.L.P., Birmingham, for appellants/cross appellees BellSouth Mobility, Inc., and BellSouth Cellular National Marketing, Inc.
Jere F. White, Jr., Madeline H. Haikala, Ivan B. Cooper, and Kevin E. Clark of Lightfoot, Franklin & White, L.L.C., Birmingham; and Richard A. Freese and Leslie E. McFall of Langston, Frazer, Sweet & Freese, P.A., Birmingham, for appellees/cross appellants Cellulink, Inc., and Eugene Ogletree.
WOODALL, Justice.
BellSouth Mobility, Inc. ("BellSouth"), appeals from a judgment entered on a jury verdict in favor of Cellulink, Inc. (appeal no. 1990082). Cellulink and Eugene Ogletree cross appeal from a judgment entered on that jury verdict and from a summary judgment entered in favor of BellSouth Mobility, Inc. (appeal no. 1990224). As to case 1990224, we affirm, but as to case 1990082, we reverse and remand.[1]
Most of the pertinent facts are undisputed. BellSouth provides cellular telephone service to customers in the southeastern United States. On January 2, 1994, Eugene Ogletree, the owner of Cellulink, executed a document entitled "Authorized Agency Agreement Between BellSouth Mobility, Inc. and Cellulink" (the "Agency Agreement"). Under this agreement, which was to terminate on December 31, 1998, BellSouth appointed Cellulink a "nonexclusive agent of BellSouth to solicit and contract on behalf of BellSouth with Subscribers for [cellular telephone service] in the Area [serviced by BellSouth]."
Pursuant to the Agency Agreement, Ogletree purchased telephone equipment from BellSouth for resale to potential subscribers of BellSouth's cellular telephone service. However, the income that Ogletree received from BellSouth principally consisted of "activation" commissions and "residual compensation." Specifically, BellSouth paid Cellulink a commission for every customer Cellulink persuaded to subscribe to BellSouth's telephone service. Furthermore, for every such subscription that remained active for 150 days, BellSouth paid Cellulink "residual compensation," defined as a percentage "of the amount [BellSouth] bill[ed] that Subscriber for monthly access, airtime usage and service options, excluding insurance, roamer and Equipment charges, taxes and tolls." (Emphasis omitted.)
The Agency Agreement also contained the following pertinent provisions:

*207 "ARTICLE IX QUOTAS
". . . .
"9.2 Establishment and Adjustment of Quotas. [Cellulink's] quota under this Agreement is the enrollment of 875 new [cellular telephone service] Subscribers within any consecutive ninety (90) day period. Established quota represents the minimum acceptable performance level for [Cellulink], but is not intended to be a ceiling on the number of Subscribers that Cellulink can solicit for [BellSouth's cellular telephone service].
". . . .
"9.3. Failure to Meet Quota. If Cellulink fails to meet the quota set forth in Paragraph 9.2 above, as such quota may be adjusted from time to time ..., [BellSouth] may, at its option,
"A. terminate this Agreement pursuant to Subparagraph 22.3(A)(iv); or
"B. (i) issue a warning after the first 90 day violation in any consecutive 365 day period;
"(ii) reduce Cellulink's residual compensation by fifty percent (50%) after the second 90 day violation in any consecutive 365 day period, and
"(iii) terminate the Agreement after the third 90 day violation in any consecutive 365 day period.
"Cellulink's full residual compensation shall be resumed at the beginning of the first full billing cycle after Cellulink attains its quota.
". . . .
"ARTICLE X "AGENT'S SALES FACILITIES
"[Cellulink] agrees that it will sell [cellular telephone service] and Equipment at sales facilities in the [service area] and at such additional or substitute sales facilities which [BellSouth] approves in writing from time to time during the term of this Agreement. Each of [Cellulink's]... sales facilities shall comply at all times during the term thereof with reasonable requirements which may be established by [BellSouth] for showroom and display capacity, appearance, accessibility, and efficiency and shall, at [Cellulink's] expense, display such signage identifying [Cellulink's] ... business as [BellSouth] may reasonably prescribe. [Cellulink] shall submit for approval by [BellSouth] such sales facilities, specifications and renderings of the business facility (or part thereof to be utilized for [Cellulink's] ... business) as [BellSouth] designates, approval of which will not be unreasonably withheld or withdrawn. At a minimum, each sales facility must: be a local facility which is open to the public at least eight (8) hours per day during normal business hours; be leased or owned in [Cellulink's] name; have a telephone with a number listed in the local directory and with directory assistance in [Cellulink's] name; and have at least one full-time cellular sales representative and a full-time support employee.
". . . .
"15.1 Compliance with [BellSouth] Criteria, Laws and Regulations.

". . . .
[Cellulink] shall maintain its business on a sound financial basis and comply with all legal obligations to [BellSouth], to [Cellulink's] employees, suppliers, lenders, lessors, and to federal, state and municipal authorities....
". . . .
"22.3 Termination for Cause.

*208 "A. In addition to other rights of termination set forth in this Agreement, [BellSouth] shall have the right to terminate this Agreement for cause effective upon delivery of notice of termination to [Cellulink], if [Cellulink]...
". . . .
"(iv) fails to meet the quota specified in Article IX hereof, as such quota may be adjusted.
"B. [BellSouth] shall also have the right to terminate this Agreement if [Cellulink]:
"(i) fails to comply with any material provision of this Agreement... and does not correct such failure within thirty (30) days after written notice of such failure ...; or
"(ii) fails on two or more separate occasions within any period of six (6) consecutive months to comply with any material provision of this Agreement, ... whether or not such failures to comply are corrected after notice thereof is delivered to [Cellulink]."
The Agency Agreement also specifically referenced an appended document, described as Appendix B. Appendix B provided in pertinent part: "If [Cellulink] receives Equipment under any [BellSouth] program and invoices are not timely paid, or if [Cellulink] owes [BellSouth] amounts for any other reason, ... [BellSouth] reserves the right to deduct such unpaid amounts from [Cellulink's] compensation."[2]
Additionally, the Agency Agreement provided:
"31.4 Impossibility of Performance. Neither [BellSouth] nor [Cellulink] shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or court of competent jurisdiction; (2) acts of God; (3) acts or omissions of the other party; or (4) fires, strikes, embargoes, war, insurrection or riot. [BellSouth] shall not be liable for loss or damage or be deemed to be in breach of this Agreement if technological changes occur which prohibit [BellSouth] from issuing numbers to Subscribers. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable."
Under the Agency Agreement, Ogletree operated Cellulink stores in the Birmingham area. In doing so, he confined his equipment sales to telephones and related equipment that he purchased from BellSouth.
In 1994, Ogletree began discussing with BellSouth officials a proposal that involved the operation of booths, or "kiosks," in Wal-Mart stores within BellSouth's servicing area for the sale of BellSouth equipment *209 and the solicitation of BellSouth's air-time subscriptions. Those discussions led to the execution of a "Letter Agreement" between Cellulink and BellSouth, dated October 12, 1994. The Letter Agreement evidenced the intent of the parties "with respect to the activation by Cellulink of subscribers to the radio-telephone service of BellSouth Mobility," but, specifically, with respect to "activations of subscribers in the Inverness Wal-Mart,... and up to three other Wal-Mart ... stores to be mutually agreed upon by Cellulink and BellSouth Mobility." (Emphasis added.)
The Letter Agreement expressly authorized Ogletree to sign leases with Wal-Mart. Under the Letter Agreement, BellSouth agreed to supply the "furniture and fixtures" of the kiosk at the Wal-Mart store in Inverness (the "Inverness Wal-Mart"). In an addendum to the Letter Agreement, the furniture and fixtures were valued at $9,750.00. BellSouth was to retain ownership of the furniture and fixtures, which it agreed to lease to Cellulink for $1.00 per year. Additionally, BellSouth agreed to "be responsible for the monthly lease space rental charges owed to the respective Wal-Mart ... in the amount of $1,000.00 per month." Cellulink agreed to execute the lease with Wal-Mart and to "assign the lease to [BellSouth] in the event that Cellulink cease[d] operation at a particular location." BellSouth also agreed to pay Cellulink $28,945.00 for "market development," which included (1) $2,250.00 for "signage," that is, outdoor and indoor banners; (2) a telephone deposit of $600.00; and (3) $3,470.00 in "miscellaneous start-up" expenses, including advertising and stationery. Finally, BellSouth agreed to pay Wal-Mart "10% of the monthly cellular telephone sales activated through BellSouth." The Letter Agreement also specifically noted that it was subject to all the terms and conditions of the Agency Agreement, and that residual compensation would be paid Cellulink "in accordance with the Agency Agreement."
Ogletree did, indeed, execute a lease agreement (the "Lease Agreement") with the Inverness Wal-Mart. The Lease Agreement provided in pertinent part:
"BellSouth Mobility will pay Wal-Mart $1000.00 per month for rent plus 10% commission on cellular telephone retail sales and $5.00 per pager sold. [Cellulink] will need a 60-day grace period from the first day the kiosk is actually operating before implementing this payment structure in order to get the store up and running.
". . . .
"Wal-Mart will agree to a lease term of one year. Either party can cancel this lease agreement with 90 days written notification to the other."
Subsequently, Ogletree installed and operated the kiosk in the Inverness Wal-Mart. Indeed, he eventually executed similar leases for kiosks in three other Wal-Mart stores in the Birmingham area, as contemplated in the Letter Agreement. However, he never installed or operated kiosks in those stores.
Between February 1995 and July 1995, Wal-Mart and ALLTEL Mobile Communications, Inc. ("ALLTEL"), concluded an agreement giving ALLTEL the right to sell cellular telephones and air time in Wal-Mart stores throughout the nation. On July 10, 1995, ALLTEL and BellSouth executed a "Program Facilitator Agreement," whereby BellSouth would "coordinate" the Wal-Mart/ALLTEL agreement in the southeastern United States. Also, to that end, Wal-Mart and BellSouth executed a "Wireless Communication Retail Distribution Agreement" (the "Distribution Agreement") on July 10, 1995, giving *210 BellSouth the right to sell cellular telephone equipment and solicit air-time subscriptions at kiosks in Wal-Mart stores throughout the southeastern United States. The Distribution Agreement required BellSouth to staff the kiosks with its own employees.
Meanwhile, the relationship between BellSouth and Cellulink was becoming strained. In April 1995, the outstanding balance of Cellulink's equipment account with BellSouth exceeded $500,000. That month, BellSouth "froze Cellulink's line of credit," and, for the next few months, deducted from its periodic payments to Cellulink portions of the commissions and residual compensation. In September 1995, after some negotiation between Ogletree and Dan Smith, BellSouth's "Regional Vice-President," BellSouth lifted the credit restrictions and ceased withholding the commissions and residuals.
Two months later, by a letter dated November 14, 1995, Dan Smith, the manager of the Inverness Wal-Mart,[3] served Ogletree, "[u]pon instruction from [ALLTEL]," a "90 day termination notice" of the Lease Agreement. Consequently, Cellulink vacated the kiosk at the Inverness Wal-Mart. BellSouth subsequently staffed the kiosk with its own employees.
On April 2, 1996, Cellulink and Ogletree, individually, sued BellSouth. The complaint as ultimately amended contained counts of (1) breach of contract, (2) fraud, (3) "tortious interference with business or contractual relations," and (4) breach of fiduciary duty. BellSouth's answer to the complaint contained a breach-of-contract counterclaim, seeking payment in the amount of $433,871.00 allegedly due from Cellulink for equipment.
On May 16, 1997, BellSouth addressed a letter to Cellulink, stating: "In accordance with Paragraphs 9.3(A) and 22.3(A)(iv) of the Authorized Agency Agreement between our companies effective January 2, 1994, BellSouth ... hereby elects to terminate the referenced Agreement as of May 16, 1997 due to your company's failure to meet quota." (Emphasis added.)
BellSouth moved for a summary judgment on Cellulink's claims of fraud and breach of fiduciary duty. The trial court granted that motion on November 30, 1998. The summary judgment also eliminated Ogletree's individual claims.
The cause proceeded to trial. At the conclusion of all the evidence, BellSouth challenged the sufficiency of the evidence as to Cellulink's claims of breach of contract and tortious interference in a motion for a judgment as a matter of law, pursuant to Ala.R.Civ.P. 50(a) ("JML"). Cellulink, in turn, moved for a JML on BellSouth's breach-of-contract counterclaim. The trial court denied the motions.
The jury awarded BellSouth $206,909.00 on its counterclaim. However, it awarded Cellulink $34,073.00 on its breach-of-contract claim, and $8,127,500.00 on its tortious-interference claim. Both parties filed post-trial motions. As to the verdict against BellSouth on the tortious-interference claim, BellSouth filed a motion for "Judgment as a Matter of Law; to Alter or Amend the Judgment; or, in the Alternative, for a New Trial, or Remittitur."[4] As to BellSouth's counterclaim, Cellulink renewed its motion for a JML, and moved, in the alternative, for a remittitur or a new trial.
*211 The trial court overruled Cellulink's motion, and overruled BellSouth's motion in part. It separated the general damages award of $8,127,500.00 into compensatory and punitive damages and ordered a remittitur. More specifically, it conditioned the denial of a new trial on Cellulink's agreement to accept a judgment on the tortious interference claim in the amount of $220,000.00 in compensatory damages, and $3,300,000.00 in punitive damages, for a total judgment of $3,554,073.00 ($220,000.00 + $34,073 + $3,300,000 = $3,554,073). Cellulink agreed to the remittitur, while reserving its rightin the event BellSouth appealedto seek reinstatement of the original verdict. BellSouth and Cellulink appealed (appeal no. 1990082) and cross appealed (appeal no. 1990224), respectively. We shall first address BellSouth's appeal.

I. Appeal No. 1990082
BellSouth argues that the trial court erred in denying its motions for a JML on the tortious-interference claim. Cellulink based this claim on the termination of the Lease Agreement it had with Wal-Mart, pursuant to which Cellulink operated its kiosk in the Inverness Wal-Mart store. Cellulink contends that BellSouth interfered, not only with its relationship with the Inverness Wal-Mart store, but with its potential to operate kiosks in some 40 other Wal-Mart stores in BellSouth's service area, including the three Wal-Mart stores with which it had definite lease agreements.
BellSouth presents two arguments in response to these contentions. First, it argues that Wal-Martnot BellSouthterminated the relationship between Cellulink and Wal-Mart. Cellulink concedes that the Lease Agreement was formally terminated by Dan Smith, the manager of the Inverness Wal-Mart, in his November 14, 1995, letter. It contends, however, that BellSouth actually "tricked Wal-Mart into helping BellSouth remove Cellulink from Alabama Wal-Mart stores." Brief of Appellee, at 15 (emphasis added). It did this, Cellulink argues, in order to "eliminate the middle man." By using its own employees rather than Cellulink, Cellulink insists, BellSouth saved for itself the commissions and residual compensation it was paying Cellulink.
In support of this theory, Cellulink directs us to letters and various communications that transpired between representatives of BellSouth and Wal-Mart during the sophisticated negotiations culminating in the nationwide Wal-Mart/ALLTEL contract, and the "Distribution Agreement," which gave BellSouth the right to use its own employees to operate kiosks in Wal-Mart stores. Assuming, arguendo, that Cellulink is correct in this respect, that is, that BellSouth deliberately eliminated Cellulink by proxy, we, nevertheless, cannot conclude that the jury was entitled to consider the tortious interference claim. This is so for the reasons on which BellSouth's second argument is based.
BellSouth argues that it was a party, if not to the Lease Agreement itself, at least to the Cellulink/Wal-Mart business relationship, and, therefore, that it cannot, as a matter of law, be liable for interference with that relationship. Cellulink contends that BellSouth failed to preserve this argument for appellate review. Cellulink bases its "waiver" theory on the assertion that "BellSouth did not suggest that it was a party to Cellulink's relationship with Wal-Mart until after the jury returned a verdict in favor of Cellulink on Cellulink's interference claim." Opening Brief of Cellulink, at 47 (emphasis in original). Further, Cellulink argues:
"Although this Court never has addressed this specific issue, Cellulink respectfully submits that, like the competitor's *212 privilege and the defense of justification, BellSouth's contention that it was a party to Cellulink's relationship with Wal-Mart is an affirmative defense. An affirmative defense is `a matter asserted by the defendant which, assuming the complaint to be true, constitutes a defense to it.' ... When a defendant fails to plead an affirmative defense, `the defense is generally deemed to have been waived.'"
Id. at n. 22 (emphasis added). Because BellSouth's party-to-the-relationship argument was an affirmative defense, Cellulink insists, it was not sufficiently pleaded and proven. We disagree with Cellulink's basic premise, because the fact that a defendant is not a party to the relationship is an element of the plaintiff's tortious-interference claim.
"After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a `third party,' i.e., a `stranger' to the contract with which the defendant allegedly interfered." Atlanta Market Ctr. Management Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998); see also Alcazar Amusement Co. v. Mudd & Colley Amusement Co., 204 Ala. 509, 86 So. 209 (1920). This is so, because "a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract." Lolley v. Howell, 504 So.2d 253, 255 (Ala.1987).
"One is not a stranger to the contract just because one is not a party to the contract...." McLane, 269 Ga. at 608, 503 S.E.2d at 282 (emphasis added). As we recently stated in Colonial Bank v. Patterson, 788 So.2d 134 (Ala.2000): "[W]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized." See also Electronics Store, Inc. v. Cellco Partnership, 127 Md. App. 385, 732 A.2d 980, 991 (Spec.App.) ("[Plaintiff agent] has not pointed to any factual evidence to show that an independent contract or other legally protected relationship existed" with potential subscribers of the cellular telephone service of the defendant, its principal), cert. denied, 356 Md. 495, 740 A.2d 613 (1999). Because the absence of the defendant's involvement in the business relationship is an element of the plaintiff's tortious-interference claim, we reject Cellulink's contention that BellSouth may not assert that argument on appeal.[5]
"The denial of a defendant's motion for a JML is proper only when the plaintiff has presented substantial evidence to support each element of the plaintiffs claim." Kmart Corp. v. Bassett, 769 So.2d 282, 284 (Ala.2000); Jefferson County v. *213 Thompson, 766 So.2d 138, 142 (Ala.1999); Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1252 (Ala.1998); Looney v. Davis, 721 So.2d 152 (Ala.1998). Moreover, "[t]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position." Pruitt v. Pruitt, 343 So.2d 495, 500 (Ala.1976) (internal quotations omitted). See also Rockport Pharmacy, Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 197 (8th Cir.1995).
This Court has long recognized that appellate review is preserved by a Rule 50(a) motion "alleg[ing] a lack of evidence" as to each of the plaintiff's claims. Cincinnati Ins. Co. v. Little, 443 So.2d 891, 893 (Ala. 1983) ("Cincinnati, having directed its motion to each count, therefore properly preserved... alleged errors for appeal"). Thus, in Lawrence v. Lackey, 451 So.2d 278 (Ala.1984), this Court concluded that a Rule 50(a) motion stating "[t]hat the Plaintiffs have failed to prove a prima facie case of bad faith against the Defendant," preserved for appellate review the denial of the motion as to the bad-faith claim. Id. at 278-79 (emphasis added). See also Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 636 (8th Cir. 1998) (defendant in an action alleging race discrimination preserved for appellate review its objection to the imposition of punitive damages by asserting in its JML motion that the evidence was insufficient for a finding of race discrimination).
At the close of Cellulink's evidence, BellSouth moved for a JML on the grounds that the "evidence is insufficient to support [the] plaintiffs alleged claims that the defendants, separately or severally, wrongfully interfered with any business [or contractual] relationship the plaintiff Cellulink, Inc. had with Wal-Mart." At the close of all the evidence, and after trial, BellSouth renewed its JML motion, reiterating these arguments. These arguments challenged the sufficiency of the evidence as to each element of the tortious-interference claim. Consequently, BellSouth has not waived its right to rely on the party-to-the-contract argument as a ground for reversal of the judgment on appeal.
Our review of the tortious-interference claim is guided in particular by Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238, 247 (Ala. 1992). That case involved a dispute between two wholesale beer distributors, Horn Beverage Company, Inc. ("Horn"), and Bama Budweiser of Montgomery, Inc. ("Bama"), over the right to sell products supplied to them by Anheuser-Busch, Inc. Prior to that dispute, there existed between the predecessors of Horn and Bama an "unwritten informal agreement," whereby Horn's predecessor occasionally sold Anheuser-Busch's products in an area that Anheuser-Busch had designated to Bama's predecessor. Id. at 242. Both Horn and Bama neededand received Anheuser-Busch's approval in order to effectuate the contracts for the purchases of the distributorships from their respective predecessors.
After Horn and Bama acquired their distributorships, Anheuser-Busch, at the instance of Horn, formally expanded the sales area it had allotted to Horn to conform to the long-standing oral agreement. Subsequently, Bama sued Anheuser-Busch, alleging that Anheuser-Busch had tortiously interfered with the contract under which Bama purchased its wholesale beer distributorship. The "trial court determined that Anheuser-Busch was a party to [that] contract," and entered a summary judgment in favor of Anheuser-Busch.
This Court affirmed that judgment. In doing so, it stated: "A party to a particular *214 contract cannot, as a matter of law, be liable for tortious interference with that contract." Id. at 247. It particularly noted that the contract under which Bama purchased its wholesale distributorship "required Anheuser-Busch's approval, without which the transfer could not be completed." Id. Moreover, it explained, "[a]bsent Anheuser-Busch's consent and affiliation, neither [Bama] nor [its predecessor] could market or sell Anheuser-Busch products."
This case is analogous to Bama Budweiser in that, absent BellSouth's "affiliation and approval," Cellulink and Wal-Mart could not have consummated the Lease Agreement. In fact, Ogletree conceded at trial that he needed BellSouth's permission to operate kiosks in Wal-Mart. Specifically, he stated:
"Q. [By counsel for Cellulink] Did that [Letter Agreement] deal with anything other than the [Inverness Wal-Mart] store and a couple others that were listed that you wanted to go into?
"A. [Ogletree] This was separate. This was specifically identifying those stores that [BellSouth] agreed to let me go into."
(Reporter's Transcript, at 947-48.) (Emphasis added.) Similarly, the Agency Agreement between Cellulink and BellSouth necessarily made BellSouth a party to every air-time subscription solicited by Cellulink at Wal-Mart. Like the beer distributorships that sold Anheuser-Busch's products, Cellulink sold BellSouth equipment and air time while in Wal-Mart only BellSouth equipment and air time.
In this connection, Cellulink was, under both the Agency Agreement and the Letter Agreement, on the premises of the Inverness Wal-Mart store only by the express permission of BellSouth. Indeed, Article X of the Agency Agreement required BellSouth's written approval for "additional or substitute sales facilities." On the basis of the Letter Agreement, BellSouth owned the kiosk erected in the store, including the furniture and fixtures valued at $9,750.00. BellSouth paid Cellulink for advertising, and paid Wal-Mart commissions in the amount of "10% of the monthly cellular telephone sales [Cellulink] activated" on the premises.
Finally, the Lease Agreement itself expressly defined certain rights and obligations of BellSouth vis-à-vis Wal-Mart. Specifically, it obligated BellSouth to pay Wal-Mart $1,000.00 per month for floor space. Although the Lease Agreement was actually executed by Ogletree, his signatory authority was derived from the Letter Agreement.
The undisputed facts thus compel the conclusion that BellSouth was anything but a stranger to the relationship between Cellulink and Wal-Mart. Consequently, it is immaterial whether, as Cellulink contends, BellSouth played a clandestine role in the negotiations between Wal-Mart and ALLTEL that eventually led to Cellulink's eviction from the Inverness Wal-Mart store. Because of its own rights and duties arising out of (1) the Agency Agreement, (2) the Letter Agreement, and (3) the Lease Agreement, BellSouth had the legal right to terminate Cellulink's relationship with Wal-Mart directly. Clearly, BellSouth could do indirectly what it had the right to do directly. We will not "superimpose on a wrongful-interference claim a requirement of good faith that would compel a party to forgo any reliance on a legal right conferred by the agreement[s] underlying the ... relationship." Patterson, 788 So.2d at 139. Where "[t]he conduct of [the defendant] that [the plaintiff] condemns is specifically allowed by the agreement[s]," the plaintiff, *215 "by characterizing that conduct as conduct taken in bad faith, cannot defeat [the defendant's] right to take that action." Id. "Improper motives cannot transform lawful actions into actionable torts." Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 211 (Tex.1996). "Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right." Id. (internal quotations omitted).
Under these facts, Cellulink was not entitled to recover on its claim of tortious interference with a business relationship. Consequently, the trial court erred in denying BellSouth's motions for a JML. The judgment entered on the jury verdict against BellSouth is, therefore, reversed.[6] We next address the cross appeal.

II. Appeal No. 1990224
In its cross appeal, Cellulink asks this Court to (1) reinstate the original verdict, (2) reverse the judgment for BellSouth on its breach-of-contract counterclaim, (3) reverse the summary judgment in favor of BellSouth on Cellulink's fraud claims, (4) reverse the summary judgment on the breach-of-fiduciary-duty claim, and (5) reverse the summary judgment on Ogletree's individual claims. We first address the breach-of-contract claim.

A. Breach of Contract
The jury awarded BellSouth $206,909.00 on its counterclaim against Cellulink for payments allegedly due on equipment BellSouth had supplied Cellulink. Cellulink does not dispute the amount that was due, that is, it does not argue that it did not receive equipment for which it failed to pay. It argues only that its performance under the Agency Agreement has been excused or discharged by BellSouth's own conduct.
For that proposition, it relies on the provision in the Agency Agreement purporting to relieve a party from liability "for loss or damage ... if its failure to perform its obligations results from ... acts or omissions of the other party." Cellulink argues that BellSouth's actions, namely, (1) the "freezing" of Cellulink's credit and the withholding of a percentage of Cellulink's commissions and residual compensation for a time in 1995; and (2) the termination of the Agency Agreement before its expiration date for failure to meet its quota, relieved Cellulink of its responsibility to pay BellSouth for equipment it had supplied Cellulink on credit. This is so, Cellulink argues, because BellSouth's actions placed Cellulink in a financial strait.
Significantly, however, Cellulink concedes that these actions were expressly authorized by the Agency Agreement. For example, the termination of the Agency Agreement is expressly authorized by ¶¶ 9.3(A), and 22.3(A)(iv), for failure to "meet quota." It is undisputed that when BellSouth terminated the Agency Agreement more than a year after Cellulink commenced this actionCellulink was not meeting its quota.
Furthermore, the Agency Agreement provided that if Cellulink "receive[d] Equipment ... and invoices [were] not timely paid, or if [Cellulink] owe[d] [BellSouth] amounts for any other reason, ... [BellSouth had] the right to deduct such unpaid amounts from [Cellulink's] compensation." More generally, ¶ 15.1 required Cellulink to "maintain its business on a *216 sound financial basis and comply with all legal obligations to [BellSouth]."
Reduced to its essence, Cellulink's argument is that the performance by one party according to the unambiguous terms of a contract discharges the duty of the other party to perform the unambiguous, reciprocal duties. It cites no legal authority for such a proposition, and we know of none.
Indeed, the settled rules of contract construction compel a contrary conclusion. "It is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties." Weathers v. Weathers, 508 So.2d 272, 274 (Ala.Civ.App.1987). If there is any ambiguity in the Agency Agreement, it regards, of course, the intent of the parties as to the effect of the phrase, "acts or omissions of the other party." However, "it is presumed that parties intend to make reasonable contracts"; therefore, "courts will give ambiguous contracts a reasonable construction." Id. (emphasis added).
In ordinary experience, contracting parties do not contemplate that the prescribed performance of one party will excuse the reciprocal performance of the other party. In fact, one party's performance generally shifts, or increases, the burden on the other party, as where the delivery of goods gives rise to a reciprocal duty to pay. Such reciprocity is, however, the essence of contracts, and of the contracting process.
We see nothing in the Agency Agreement suggesting that the parties intended the result urged by Cellulink. The "Impossibility-of-Performance" section on which Cellulink relies also includes factors, such as, acts of God, war, and illegality. These are contract provisions of the most ordinary sort. Considering this paragraph in context counsels against attaching such an extraordinary meaning to the phrase "acts or omissions of the other party" as Cellulink does. We conclude, therefore, that the trial court did not err in denying Cellulink's motion for JML, remittitur, or new trial, on BellSouth's counterclaim. We next address the summary judgment entered in favor of BellSouth on Cellulink's fraud claims.

B. Fraud
"Our standard for reviewing a summary judgment is well settled. A summary judgment is proper if there was no genuine issue of material fact and the movant was entitled to a judgment as a matter of law." Callens v. Jefferson County Nursing Home, 769 So.2d 273, 278 (Ala.2000). "In determining whether the nonmovant has created a genuine issue of material fact, we apply the `substantial-evidence rule' evidence, to create a genuine issue of material fact, must be `substantial.'" Id. at 278-79. "[S]ubstantial evidence is evidence of such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). What is to be evaluated is that body of evidence that was before the trial court when it entered its summary judgment. Cowen v. M.S. Enters., Inc., 642 So.2d 453, 454-55 (Ala.1994). In this case, therefore, our review is limited to the evidence that was in the record on November 30, 1998, when this summary judgment was granted.
Cellulink contends that BellSouth committed two species of misrepresentation, namely, (1) fraud, and (2) promissory fraud. We first address the fraud claim.

(1) Fraud
This claim is based on what Cellulink alleges is a misrepresentation that *217 BellSouth was "committed to its agents." Appellee's Reply Brief, at 55. It argues that BellSouth "lied to Ogletree when it stated that it was Cellulink's `partner' and that it was committed to the agency channel." Id. at 52. Ogletree presented an affidavit, in which he defined more precisely the character of this representation. He stated:
"From the time Cellulink became an authorized agent, BellSouth Mobility repeatedly stressed that we were `partners' and that our relationship was a `long term partnership.' Representatives of BellSouth regularly described the relationship both orally and in writing as a `financial partnership.' BellSouth invited our trust and stressed that it was totally committed to the success of Cellulink. In November 1993 I received a letter from Sarah Relfe, Director Sales for BellSouth. In the letter she reiterated statements she made to me orally including that: `BellSouth Mobility is totally committed to our strategic long term partnership.' She went on to say that BellSouth looked forward to `continuing a strong partnership far into the future.' These and similar comments were made throughout our relationship, both before and after I signed the agency agreement."
For the following reasons, such statements as these were not actionable.
A fraud action relating to events that occurred before March 14, 1997, must be based upon (1) a false representation of (2) an existing, material fact, (3) upon which the plaintiff justifiably relied (4) to his damage. Kline v. Resort Inv. Corp., 547 So.2d 495, 497 (Ala.1989).[7] Consequently, the plaintiff must show that the defendant's statements "were representations of fact and not mere statements of opinion amounting to nothing more than sales talk or `puffery.'" Gable v. Boles, 718 So.2d 68, 70 (Ala.Civ.App.1998) (emphasis added). "[S]tatements of opinion amounting to nothing more than `puffery' ... are not statements concerning material facts upon which individuals have a right to act and, therefore, will not support a fraud claim." Fincher v. Robinson Brothers Lincoln Mercury, Inc., 583 So.2d 256, 259 (Ala. 1991). For example, American Pioneer Life Ins. Co. v. Sherrard, 477 So.2d 287 (Ala.1985), involved a statement by the potential underwriter of an "idea for a combined annuity/mortgage protection policy," that the idea was the underwriter's "number one priority." This Court held that the statement was mere "puffery," and, consequently, would not support a claim of fraud by the plaintiff, who invested in the idea.
Similarly, representations that BellSouth was "committed to its agents" are puffery, and not the types of statement that will support a fraud claim. The trial judge did not err in granting BellSouth's motion for a summary judgment on this claim.

(2) Promissory Fraud
In Howard v. Wolff Broadcasting Corp., 611 So.2d 307 (Ala.1992), cert. denied, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993), this Court stated:
"To establish a cause of action for promissory fraud, the plaintiff must prove: (1) that the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation *218 was made with a present intent to deceive; and (5) that when the representation was made the defendant intended not to perform in accordance with it."
Id. at 311. See also Pinyan v. Community Bank, 644 So.2d 919, 923 (Ala.1994); Capitol Constr. Co. v. Alabama Exterior Supply, Inc., 696 So.2d 1087, 1090 (Ala. Civ.App.1997). "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive." Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774, 776 (Ala.1998) (emphasis added).
In support of its promissory-fraud claim, Cellulink states: "Cellulink stated a claim for promissory fraud arising from BellSouth's misrepresentation that Cellulink would be included in a marketing program with Wal-Mart." Brief of Appellee, at 82. However, the only "representation" to which it directs usthat was timely before the trial courtwas an alleged statement by Bob Faught. Faught was BellSouth's "director of consumer sales and marketing." This statement was contained in Ogletree's affidavit, where he stated: "Mr. Faught made clear to me that if BellSouth got into Wal-Mart I would be there too." Just how Faught made the idea "clear" to Cellulink is, however, left to speculation. Its very vagueness precludes independent review of its evidentiary sufficiency. In other words, the statement does not constitute "substantial" evidence of any promise.
In short, Cellulink has directed us to no representation sufficient to support a promissory-fraud claim. Consequently, the trial court did not err in granting a summary judgment on this claim.[8]
In summary, the judgment of the trial court in appeal no. 1990082 is reversed and the cause is remanded for proceedings consistent with this opinion. The judgment in appeal no. 1990224 is affirmed.
1990082REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., and LYONS and JOHNSTONE, JJ., dissent.
1990224AFFIRMED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., dissents.
LYONS, Justice (concurring in case no. 1990224 and dissenting in case no. 1990082).
In case no. 1990082, the majority reverses the judgment based on a jury verdict in favor of Cellulink and against BellSouth for tortious interference and remands. The majority concludes that Cellulink had the burden of establishing the absence of BellSouth's involvement in the business relationship as an element of its claim for tortious interference. Then the majority finds that BellSouth's preverdict motions for a judgment as a matter of law ("JML") sufficiently stated grounds to support granting those motions and reverses the trial court for failure to grant those motions.
That a party to a contract or relationship cannot be liable for tortious interference with that contract or relationship is well settled under Alabama law. In Harrell v. Reynolds Metals Co., 495 So.2d 1381, 1387-88 (Ala.1986), this Court held:

*219 "Although the torts of interference with contractual relations (Evans v. Swaim, 245 Ala. 641, 18 So.2d 400 (1944)), and interference with business relations (Mims v. Citizens Bank of Prattville, 372 So.2d 311 (Ala.1979)), are recognized under Alabama law, the alleged tortfeasor, by definition, must be independent of, or a third party to, the particular relation. Restatement (Second) of Torts § 766 (1979). It is well settled that a party to the `relation' cannot be held liable for interference with that relation. George A. Davis, Inc. v. Camp Trails Co., 447 F.Supp. 1304, 1309 (E.D.Pa.1978); West v. Troelstrup, 367 So.2d 253 (Fla.Dist.Ct.App.1979); Continental Casualty Co. v. Mirabile, 52 Md. App. 387, 449 A.2d 1176 (1982)."
The majority rejects Cellulink's argument, based upon Rule 8(c), Ala.R.Civ.P., that BellSouth waived its right to assert that it was a party to the business relationship because BellSouth failed to raise this issue as an affirmative defense and in its answer. If I were writing on a clean slate, I would first analogize the issue whether one is a party to, or a stranger to, a business relationship to the issue of privilege; I would then conclude that it is more appropriately treated as an affirmative defense. The majority cites Atlanta Market Center Management Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998), to support its conclusion that the plaintiff has the burden to establish that the defendant is a "third party" or a "stranger" to the contract with which the defendant has allegedly interfered. In NationsBank, N.A. v. SouthTrust Bank of Georgia, N.A., 226 Ga.App. 888, 487 S.E.2d 701 (1997), the Georgia Court of Appeals dealt with the question whether a bank was a stranger to a relationship involved in an action alleging tortious interference by the bank. In concluding that a relationship existed and that that relationship established a privilege, the Georgia court stated:
"`The particular privilege applicable here is the protection of the speaker's interest under OCGA § 51-5-7(3). This privilege, while primarily applicable to claims of libel or slander, may also be asserted as a defense to a claim for tortious interference with contractual relations. See Kitchen Hardware [Ltd. v. Kuehne & Nagel, Inc., 205 Ga.App. 94, 97(3), 421 S.E.2d 550 (1992)]. "[S]tatements made with a good faith intent on the part of the speaker to protect his interest in a matter in which he is concerned are privileged. OCGA § 51-5-7(3)." Id. at 96 [421 S.E.2d at 550].'"
226 Ga.App. at 892, 487 S.E.2d at 706 (quoting Choice Hotels Int'l, Inc. v. Ocmulgee Fields, Inc., 222 Ga.App. 185, 188, 474 S.E.2d 56, 59 (1996)). The Georgia statute (OCGA § 51-5-7(3)) applicable in defamation cases and found by the Georgia Court of Appeals in Kitchen Hardware to be analogous to issues as to status as a stranger vel non in tortious-interference cases deals specifically with the privilege available for statements made in protection of the speaker's interest. A defendant in a tortious-interference action who claims that any actions taken or statements made should not be the basis for liability because of that defendant's relationship to the matter made the basis of the plaintiff's complaint essentially asserts a defense of privilege or justification.
Our defamation cases have consistently recognized that the defense of privilege is an affirmative defense. See, e.g., Ex parte Blue Cross & Blue Shield of Alabama, 773 So.2d 475 (Ala.2000). However, as earlier noted, we are not writing on a clean slate.
"[In Georgia, i]n order to prevail on a claim alleging tortious interference with contract, a plaintiff must establish the existence of a valid contract and that the *220 defendant acted intentionally, without privilege or legal justification, to induce another not to enter into or continue a business relationship with the plaintiff, thereby causing the plaintiff financial injury."
Atlanta Market Ctr., 269 Ga. at 608, 503 S.E.2d at 282 (emphasis added). Placing the burden on the plaintiff to demonstrate the absence of privilege or legal justification justifies the conclusion of the Georgia court in Atlanta Market Center, relied upon by the majority, that the plaintiff, as an element of its case, must establish that the defendant is a "third party" or a "stranger" to the contract.
The solution to this issue of appropriate treatment of the burden of proof would be simple if our caselaw consistently adhered to the same rule. However, in Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296 (Ala.1990), Justice Houston, writing for a unanimous Court, stated:
"We note that in the past we have listed an absence of justification for the defendant's interference as one of the elements of the plaintiffs cause of action; however, we recognize today that it is illogical to continue to list an absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it."

571 So.2d at 298 (emphasis added). Unfortunately, subsequent cases have continued to describe the plaintiffs burden of proof in an action for tortious interference without acknowledging the modification of the rule in Century 21 Academy Realty. See, e.g., Colonial Bank v. Patterson, 788 So.2d 134 (Ala.2000), for which I must take responsibility, and Soap Co. v. Ecolab, Inc., 646 So.2d 1366, 1370-71 (Ala.1994), where absence of justification again appears as an element of the plaintiffs cause of action, without reference to the rule announced in Century 21 Academy Realty. While I believe that Century 21 Academy Realty states the better and more sensible rule, given the confused state of our precedent it would be unjust to penalize BellSouth for not complying with it. I therefore concur with the majority's conclusion, albeit on different grounds, that BellSouth did not, by failing to include the defense in its answer, waive the right to insist that it was not liable because it was not a stranger to the relationship.
Before BellSouth can obtain a reversal of the judgment against it and a JML in its favor, it must have complied with Rule 50, requiring preverdict and postverdict motions for a JML. King Mines Resort, Inc. v. Malachi Mining & Minerals, Inc., 518 So.2d 714 (Ala.1987). Rule 50(a)(2) provides that "[s]uch a motion [for a JML] shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." The majority relies upon Cincinnati Insurance Co. v. Little, 443 So.2d 891 (Ala.1983), where this Court found the motion for directed verdict (now JML) to be sufficient. This Court there described the motion as one that "alleged a lack of evidence." 443 So.2d at 893. The majority refers to that description as if it were all the motion stated and, based on the supposition that that was all it stated, concludes that a motion merely "alleging a lack of evidence" is sufficient. 815 So.2d at 213. However, in Cincinnati Insurance this Court was only characterizing the motion and not quoting from it verbatim when it stated that "[t]he motion alleged a lack of evidence on plaintiff's claims for breach of contract, fraud, and bad faith refusal to pay." 443 So.2d at 893. For all that appears, this statement was merely a summary of a more detailed motion. The Court's merely giving a shorthand rendition was justified based upon the following *221 statement of the applicable law in Cincinnati Insurance, where the Court also stated:
"Under Alabama law:
"`[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count.' Aspinwall v. Gowens, 405 So.2d 134, 138 (Ala.1981)."
Id. (emphasis added).
The majority also relies upon Pruitt v. Pruitt, 343 So.2d 495 (Ala.1976), for the proposition that "`[t]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position.'" 343 So.2d at 500 (quoting United States v. Fenix & Scisson, Inc., 360 F.2d 260, 266 (10th Cir. 1966)). This early case dealt with the question whether an affirmative charge was sufficient, and it did not discuss the grounds-stating requirements of Rule 50(a)(1). Moreover, its holding should be confined to instances where the trial court's awareness of the movant's position cannot be fairly questioned.
In Ott v. Fox, 362 So.2d 836 (Ala.1978), this Court held that where the defendant's motion for a directed verdict at the close of the plaintiff's case and, upon renewal at the close of all the evidence, fails to state as a ground therefor any contention having to do with absence of proof on a specific issue, the issue as to lack of such evidence is considered to have been waived. Later, in Perdue v. Gates, 403 So.2d 165 (Ala. 1981), this Court embraced the liberal rule of federal cases as to what constitutes a motion for a directed verdict and treated a requested jury instruction to the effect that the jury must find for the defendant as the equivalent of renewal of the motion for directed verdict at the conclusion of the evidence. However, in Perdue, the defendants had previously moved unsuccessfully for summary judgments and, at the close of the plaintiff's evidence, had orally moved for a directed verdict. These repeated arguments against the sufficiency of the evidence justified accepting the request for an affirmative charge without hypothesis as being the equivalent of a renewal of the previous oral motion.
The record here reflects that BellSouth did not contend that it was a party to Cellulink's relationship with Wal-Mart, either in its answer, in its motion for summary judgment, in its requested jury instructions, in its closing arguments, or in its preverdict motion for a JML. Indeed, the record reflects that on two separate occasions BellSouth's regional vice president testified that Cellulink's relationship with various Wal-Mart stores in Alabama was entirely independent of BellSouth. BellSouth maintains that the trial court was aware of its contention when the court ruled on the motion. The argument was raised with great clarity in BellSouth's postverdict motion for JML. If that contention was made at all before the jury returned its verdict, to characterize its assertion as oblique may well be an overstatement. Consequently, Pruitt and Perdue are distinguishable.
Rather than hold that the trial court should have entered a JML in favor of BellSouth on this weak record of compliance with Rule 50(a)(1), I would apply the rule that when the verdict is insufficient to support the judgment, a new trial is appropriate, notwithstanding the failure to satisfy *222 the requirements of Rule 50. See King Mines Resort, 518 So.2d at 716. On remand, problems with this defense, which we can safely assume BellSouth will assert with precision before a verdict in any subsequent trial, may prove insurmountable. Nevertheless, that is not our concern today.
We should resolve this case in a manner consistent with the fundamental fairness that flows from requiring a preverdict movant for a JML to alert not only the trial court, but also the opposing party, of deficiencies in proof before the conclusion of all the evidence. The United States Court of Appeals for the First Circuit observed as follows in Mayo v. Schooner Capital Corp., 825 F.2d 566 (1st Cir.1987), with respect to the comparable federal rule:
"[T]he prudential rationale underlying Rule 50(b) is that both the opposing party and the court should be on notice of the movant's legal claim prior to the case going to the jury. This ensures that the opposing party will be able to cure any deficiency in his case and permits the judge to rule on the legal sufficiency of the case `without impinging on the jury's fact-finding province.'"
825 F.2d at 572 (quoting Martinez Moll v. Levitt & Sons of Puerto Rico, Inc., 583 F.2d 565, 569 (1st Cir.1978)).
I must therefore respectfully dissent in case no. 1990082. I concur in case no. 1990224.
NOTES
[1] This litigation has involved three "BellSouth" entities, namely, (1) BellSouth Mobility; (2) BellSouth Cellular Corp.; and (3) BellSouth National Marketing. The record contains no explanation of the precise manner in which these entities are related. The record does contain a stipulation that BellSouth Cellular Corp. "is a holding company, which provides, among other things, management for various BellSouth companies." (Clerk's Record, at 1611.) It also contains a stipulation that BellSouth Mobility and BellSouth National Marketing would "not assert as a defense against any of the claims made [in this action] that any alleged wrongful conduct was done by employees of BellSouth Cellular Corp. instead of employees of [BellSouth Mobility] and/or [BellSouth National Marketing]." Id. Thus, in referring to individuals affiliated with one or more of these entities, we will not attempt to assign them to a particular company. Instead, we will regard them as employees or representatives of "BellSouth." Similarly, we will disregard any distinction among the entities and refer to them collectively as "BellSouth." In this connection, all claims against BellSouth Cellular Corp. and BellSouth National Marketing have been resolved. Therefore, neither of those two entities is a party to this appeal. Moreover, BellSouth points out that appeal no. 1990224 refers to an entity that is erroneously styled as "BellSouth Cellular National Marketing."
[2] A similar provision was contained in a "General Purchase Agreement" (the "Purchase Agreement"), executed by the parties on the same day as the Agency Agreement. The Purchase Agreement provided in pertinent part:

"WHEREAS, [Cellulink] contemplates repetitive purchases of cellular terminal equipment (`Equipment') from [BellSouth] and through the Supplier(s) from which [BellSouth] purchases such Equipment....
". . . .
"If invoices are not timely paid and [BellSouth] owes [Cellulink] monies for any other reason, [BellSouth] reserves the right to deduct the past due sums owed hereunder from such monies."
[3] This case involves two individuals named Dan Smith.
[4] BellSouth has noteither in the trial court, or in this Courtchallenged the verdict in favor of Cellulink on its breach-of-contract claim against BellSouth.
[5] We do not overlook Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296, 298 (Ala.1990), in which this Court said:

"We note that in the past we have listed an absence of justification for the defendant's interference as one of the elements of the plaintiff's cause of action; however, we recognize today that it is illogical to continue to list an absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it."
Breland is not inconsistent with this case, because "justification" is not synonymous with the party-to-the-relationship element. On the contrary, "justification" is a much broader concept, susceptible of application in a wide variety of circumstances. See Gross v. Lowder Realty Better Homes & Gardens, 494 So.2d 590 (Ala.1986). For that reason, it is appropriate to treat justification as an affirmative defense, separate and distinct from the party-to-the-relationship element.
[6] Because of our holding in appeal no. 1990082, we do not address the implications of the trial court's disposition of the damages award.
[7] This action was commenced before March 14, 1997, the date of the release of Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala. 1997), which prospectively abandoned the justifiable-reliance rule.
[8] We have considered the arguments of Cellulink on all the remaining issues raised in its cross appeal and find them to be moot or without merit.