849 So.2d 932 (2002)
James T. PARSONS et al.
v.
Patrick AARON, and Pat & Pat, Inc.
James T. Parsons et al.
v.
Patrick Aaron, and Pat & Pat, Inc.
Patrick Aaron, and Pat & Pat, Inc.
v.
James C. Parsons et al.
1002086, 1002087 and 1010105.
Supreme Court of Alabama.
October 4, 2002.
Rehearing Applications Denied November 15, 2002.
*933 E. Allen Dodd, Jr., of Scruggs, Dodd & Dodd Attorneys, P.A., Fort Payne; and James W. Fuhrmeister of Allison, May, Alvis, Fuhrmeister, Kimbrough & Sharp, L.L.C., Birmingham, for James C. Parsons, James T. Parsons, and James C. Parsons, Inc.
John E. Medaris, Pelham, for Patrick Aaron, and Pat & Pat, Inc.
STUART, Justice.
James C. Parsons, James C. Parsons, Inc.,[1] and James T. Parsons (hereinafter *934 sometimes collectively referred to as "the Parsonses") appeal from a judgment entered by the Shelby Circuit Court in favor of Patrick Aaron and Pat & Pat, Inc. (hereinafter sometimes collectively referred to as "Aaron"), on claims of tortious interference with contractual or business relations, breach of contract, and conversion, arising out of Aaron's sale of World Gym Health and Fitness Center-Pelham (hereinafter "World Gym"), to James C. Parsons and James C. Parsons, Inc.[2] The jury awarded Aaron a total of $107,000 in compensatory damages and $193,000 in punitive damages; the trial court remitted the punitive-damages award to $60,000. Aaron filed with this Court a motion to dismiss the Parsonses' appeals as untimely filed; Aaron also conditionally cross-appeals as to the trial court's order of remittitur of the punitive-damages award. We deny the motion to dismiss the appeals and we affirm in part, reverse in part, render a judgment in part, and remand.

Procedural Background
These appeals result from two actions filed in the Shelby Circuit Court. The plaintiffs in case no. CV-98-903 are James C. Parsons ("Jimbo"), James C. Parsons, Inc. ("the corporation"), and Jimbo's father, James T. Parsons ("Jim Parsons" or "Parsons"). The Parsonses sued Aaron seeking to enjoin him from taking certain actions the Parsonses contended would violate a noncompetition agreement Aaron had entered into in conjunction with the sale of World Gym to the Parsonses.
Aaron responded by filing his own complaint in Shelby Circuit Court, suing Jimbo and the corporation (case no. CV-98-955). Aaron alleged breach of contract and conversion. In a later amendment to his complaint, Aaron added Jim Parsons as a defendant, alleging a claim of tortious interference with contractual or business relations.[3]
The Parsonses then filed a counterclaim in case no. CV-98-955, alleging that Aaron had breached the noncompetition agreement and seeking monetary damages. The cases were consolidated and all of the above-identified claims were tried before a jury. At the close of Aaron's evidence, the Parsonses moved for a judgment as a matter of law; the trial court denied that motion.
The jury returned a verdict against the Parsonses on their claim alleging breach of the noncompetition agreement and seeking an injunction. The jury returned a verdict in favor of Aaron on his claims of breach of contract, conversion, and tortious interference, awarding Aaron compensatory and punitive damages.
The Parsonses filed postjudgment motions pursuant to Rules 50 and 59, Ala. R. Civ. P., seeking a judgment as a matter of law, a new trial, or alternatively, a remittitur of the punitive-damages award. On June 6, 2001, the trial court entered on the case action summary the following notation: "by express consent of all parties pursuant to the provisions of [Ala. R. Civ. *935 P.], Rule 59.1, the post-judgment motion of the Plaintiffsi.e., `James C. Parsons, Inc., James. C. Parsons, and James T. Parsons' Alternative Post-Trial Motions Under Rules 50 and 59'shall remain pending in this court until July 6, 2001, unless said motion is ruled upon by the court prior to said date."
On July 5, 2001, the trial court entered its order on all the Parsonses' postjudgment motions. The trial court conditionally granted the Parsonses' motion for a new trial unless Aaron accepted a remittitur of the $193,000 punitive-damages award to $60,000.
On July 19, 2001, Aaron filed a motion styled "Request for Correction/Amendment of Order." In that motion, Aaron argued that the trial court should correct or amend its postjudgment order to reflect that, if Aaron accepted the remittitur, the Parsonses must agree to forgo any appeal of the judgment. Aaron asserted that the trial court had no authority to order a remittitur without also ordering that the Parsonses forgo their right of appeal upon Aaron's acceptance of the remittitur. The trial court set this motion for a hearing on August 29, 2001. On July 23, the Parsonses responded to Aaron's request for correction or amendment of the postjudgment order by noting that Rule 59(f), Ala. R. Civ. P., allows the trial court to order a remittitur and, even if accepted, Aaron would still retain the right on appeal to seek reinstatement of the entire damages award. On July 25, Aaron filed a notice styled "Involuntary Acceptance of Remittitur." However, Aaron did not withdraw his motion to correct or amend.
On August 17, 2001, the Parsonses filed their notices of appeal. They indicated that they were appealing from a final judgment and that the date of that judgment was February 15, 2001; that the date of the trial court's postjudgment order was July 5, 2001; and that two postjudgment motions had been filed: (1) the Parsonses' motion for new trial; and (2) Aaron's request for correction or amendment of the trial court's order. The Parsonses did not indicate on their notices of appeal the date of filing or the date of disposition of the postjudgment motions. However, the Parsonses added to each notice of appeal the following: "This notice is filed although some post-trial motions remain pending." These appeals are case no. 1002086 and case no. 1002087.
On August 22, 2001, Aaron filed a motion to dismiss the Parsonses' appeal in case no. 1002086, claiming that the notice of appeal in that case was not timely filed.[4] On August 29, 2001, Aaron filed a conditional cross-appeal, seeking reinstatement of the full punitive-damages award in the event the Parsonses' appeals were not dismissed as untimely. Aaron's cross-appeal is case no. 1010105.
Aaron asserts that the time for filing a notice of appeal began to run the day the trial court entered its order on the Parsonses' postjudgment motions. The trial court entered its order on those motions on July 5, 2001. Forty-two days from that date was August 16; the Parsonses filed their notice of appeal on August 17.
However, the Parsonses assert that their notice of appeal was timely because, they say, the July 5, 2001, order was not a final judgment. The Parsonses assert several bases for their position. First, they assert that their claim seeking equitable relief against Aaron (seeking to enjoin *936 Aaron from proceeding with the purchase, lease, or operation of a competing gym) was never ruled uponeven though the jury returned a verdict on that claimand that it remained pending. The Parsonses also assert that the trial court had not certified the judgment awarding damages as final for purposes of appeal.
The Parsonses also allege that the July 5, 2001, order was conditioned upon Aaron's accepting the trial court's order of remittitur. Thus, the Parsonses allege that the July 5, 2001, order was conditional; that it required further action by the parties; and that it did not have the effect of a final judgment.
The Parsonses also allege that the 42-day period did not begin to run until after all postjudgment motions had been ruled upon. The Parsonses assert that Aaron's July 19, 2001, motion styled as a "Request for Correction/Amendment of Order," prevented the 42-day period for appeal from running. The Parsonses assert that the request for correction or amendment of the order was another postjudgment motion and that, although Aaron filed a notice of acceptance of the remittitur on July 25, Aaron never withdrew the pending postjudgment motion to correct or amend. Because the trial court has not ruled upon that motion, the Parsonses argue, the request for correction or amendment of the order remains pending.

Was the Parsonses Notice Of Appeal Timely?
Rule 4(a)(1), Ala. R.App. P., provides (with limited exceptions) that a party wanting to appeal to an appellate court must file his or her notice of appeal within 42 days of the date of the entry of the judgment appealed from. Rule 4(a)(3), Ala. R.App. P., provides that the filing of a postjudgment motion under Rule 59, Ala. R. Civ. P., suspends the time for filing a notice of appeal; it provides that "the full time fixed for filing a notice of appeal shall be computed from the date of the entry in the civil docket of an order granting or denying such motion."
However, what saves the Parsonses' appeal from being untimely in this case is the effect of Rule 59.1, Ala. R. Civ. P. To avoid the automatic denial of pending motions after 90 days as mandated by Rule 59.1, the trial court entered upon the case action summary a statement reflecting that the parties had expressly consented to the posttrial motions' remaining pending until July 6, 2001, unless they were ruled upon by the court before that date. On July 5, 2001, the trial court unconditionally denied all posttrial motions except for the Parsonses' motion for a new trial, which the court denied conditioned upon Aaron's acceptance of a remittitur. Because that remittitur had not been accepted as of July 6, that aspect of the Parsonses' posttrial motions remained pending on July 6, 2001.[5] Because the Parsonses' notices of appeal were filed on August 17, 2001, 42 days after July 6, the notices of appeal were timely filed. For this reason, we deny Aaron's motion to dismiss the Parsonses' appeals.

Factual Background
From a factual standpoint, this case is riddled with conflictsinterpersonal ones among the parties and evidentiary ones presented at trial. We summarize, as best *937 we can, the evidence contained in the record.
In 1997, Jimbo initiated conversations with Patrick Aaron about Aaron's selling World Gym to Jimbo. After some negotiations, they ultimately agreed upon a purchase price of $1,700,000, and the transaction was consummated. On January 30, 1998, the parties executed a detailed "Asset Sale and Purchase Agreement" (hereinafter "the Sale Agreement").
As part of the sale transaction, Patrick Aaron also executed a "noncompetition agreement," which provided, in pertinent part:
"Aaron agrees that for a period of five (5) years from February 15, 1998, Aaron shall not, either directly or indirectly, whether as owner, partner, shareholder or employee, or in any other manner whatsoever, own, operate, manage, join, contract or participate in the ownership, management, operation or control of, or be connected in any manner with, or act as a consultant to, any business which operates a similar business to that operated by Pat & Pat, Inc. [a]s of the date of closing within the counties of Jefferson and Shelby within the State of Alabama."
The noncompetition agreement is dated February 2, 1998.
At a meeting at which only Jimbo, Patrick Aaron, and John Oei[6] were present, Jimbo and Aaron executed a document entitled "Letter of IntentPro Shop" (hereinafter referred to as "the pro shop agreement"). This agreement provided, in pertinent part:
"In effect April 1, 1998.
"I, James C. Parsons; [d/b/a] World Gym-Pelham, Alabama (henceforth, to be recognized as `the Gym,') agree to allow Patrick D. Aaron of Pat & Pat, Inc. the rights to be the exclusive supplier of certain and limited products of the `Pro Shop'; a retail site located within and used in conjunction to, the Gym. Such items include:
"....
"... Any products furnished by Patrick Aaron will be sold upon the basis of consignment with a monthly record to be kept of inventory, sales and profits. Mr. Aaron will receive 70% of all revenue received beyond the purchase price of the products described as being furnished by Mr. Aaron.
"....
"This agreement is for a term of 6 months from the day of inception to be reviewed for renewal at an identical term designed to maintain a profit ratio acceptable by both parties."
This document is dated January 28, 1998two days before the Sale Agreement was executed. However, Jimbo testified that the document was actually executed several days after the parties executed the Sale Agreement. All parties agreed that John Oei drafted the pro shop agreement.
Jimbo and Aaron also had Oei, who was not a lawyer, draft a document entitled "Letter of IntentPersonal Training" (hereinafter referred to as "the personal-training agreement"), which provided:
"I, James C. Parsons; [d/b/a] World Gym-Pelham, Alabama (henceforth, to be recognized as `the Gym,') agree to allow Patrick D. Aaron of Pat & Pat, Inc. the right to have, and receive payments for, services rendered by the personal training of clients free of charges, fees or incumbrances.

*938 "The services will need to be performed under identical precautions and restrictions as any member of the training staff conducting business at the Gym including certification, CPR training, insurance and fee restrictions paid by members, but with exemption to fees paid to the Gym.
"This agreement can be void and Mr. Aaron be subject to banishment from the Gym if his actions or interpretation of services are considered detrimental toward the Gym under the same guidelines and boundaries given to all other persons working in a similar position."
Although the record does not contain an executed copy of this agreement, the parties did not dispute that, after Jimbo purchased World Gym, Aaron was allowed to conduct personal training at the gym for his clients at no charge to him.
In conjunction with this transaction, Jimbo formed the corporation, of which he was the sole shareholder and the only officer. In February 1998, the corporation took ownership and began operation of World Gym.

Testimony of Patrick D. Aaron
Patrick Aaron was a minority shareholder in Pat & Pat, Inc., a family owned corporation that owned World Gym.[7] Aaron served as the president and general manager of World Gym; Aaron's mother and his wife also worked at the gym.
Aaron testified that Jimbo approached him about purchasing the gym and that ultimately he and Jimbo agreed on a purchase price of $2,000,000. When they reached that agreement, Jimbo, Oei, and Julie Kitchings, a personal friend of Jimbo's, began to work at World Gym, in order to conduct what Aaron described as a "due diligence" analysis.
When Jimbo learned that he could obtain financing for only $1,700,000 of the purchase price, Jimbo and Oei made additional offers designed to compensate Aaron for the $300,000 reduction in the purchase price. Jimbo and Oei offered to allow Aaron to keep and to continue operating the pro shop at World Gym, selling clothes, certain health and fitness products, nutritional supplements, and equipment. Jimbo and Oei also offered to allow Aaron to continue to train his fitness clients at the gym at no cost to Aaron. Aaron also testified that he and his family were to receive lifetime memberships to the gym. Aaron agreed to this offer because, he stated, this offer would net him several thousand dollars per month in income, which, over time, would compensate him for the $300,000 shortfall in the purchase price. On cross-examination, Aaron was asked why, if, as he claimed, all of the agreements were part of the same transaction, the documents for each were prepared by different persons and were executed on different dates.
Patrick Aaron testified that, after Jimbo took over the gym, Aaron and Kitchings experienced personal conflicts. Aaron acknowledged that he did not like Kitchings and that he was critical of Kitchings to Jimbo. Aaron testified that, as early as February 1998, he warned Jimbo that Kitchings was "taking money from the club," "that she was belittling the staff," and that she was "causing chaos throughout the club." Aaron told Jimbo "she was nothing but trouble to that club." According to Aaron, he relayed this information to Jimbo as Jimbo's consultant and in confidence *939 so that Jimbo could monitor the gym for himself.[8]
Aaron denied Kitchings's claim that he had threatened to "knock [Kitchings's] head off," that he had ever cursed in front of members at the gym, or that he had ever done anything to hurt World Gym. Aaron testified that, even after he sold World Gym to Jimbo, he wanted World Gym to succeed. As evidence of this, he stated that he had agreed to act as a consultant to Jimbo without being paid for those services and that he had voluntarily mopped floors to help Jimbo and the gym.
Aaron acknowledged that before his noncompetition agreement with World Gym expired, he was approached by Ron McNeeley, an employee of World Gym who had become unhappy with World Gym and who wanted to open a competing gym. McNeeley asked Aaron if he would be interested in building a facility to be used as a gym and then leasing it to McNeeley. Aaron admitted that he contemplated this proposal.
Aaron telephoned Jimbo to ask if owning and leasing a building in which a gym was located would violate his noncompetition agreement. Aaron said that Jimbo instructed him to telephone Jim Parsons. Aaron called Parsons with his question; he did not remember the exact date of his telephone conversation with Parsons, but he recalled that it occurred before his termination from World Gym. According to Aaron, Jim Parsons responded, "I don't think that it does.... Let me talk to my attorney, and you talk to your attorney.... I don't think it does."
Aaron testified that, as early as July 1998, he heard rumors among the employees of World Gym that he was going to be fired. Aaron stated that because of those rumors, he continued to consider the possibility of other business ventures.
Aaron testified that he was fired from World Gym on August 10, 1998. Aaron testified:
"A: And that day that I came in on August 10, Zane Woodward told me, `Patrick, I don't want to have to tell you this, but I'm going to have to ask you to leave the premises.' And I asked him, `Why am I going to have to leave the premises?'
"He said, under [Kitchings's] instructions, she told me if you don't leave the premises, for me to call the police and have them escort you off the premises. At that time is when I went in and called Jimbo and told Jimbo, `Jimbo, I think it's apparent that we need to have a meeting and talk.' And thirty minutes later him and his dad showed up.
"Q: And you went into that meeting. Who spoke during that meeting? Did you speak?
"A: No, sir. Mr. [Jim] Parsons did most of the speaking.
"Q: What did Mr. Parsons tell you, as best you can remember?
"A: Mr. Parsons told me, he said, `Patrick,' he said, `we're having some conflicts with you and [Kitchings]. And we think that it would be in our best interest if we ask you to leave the premises of World Gym and never step foot back on the premises of World Gym.'
"And I looked at him, and I said, `Mr. Parsons, me and Jimbo have an agreement to where II have *940 the pro shop. I have a personal training agreement with Jimbo and a complimentary free membership for life at this club.' And he looked at me, and he said, `You no longer do.' And he put his finger in my face and said, `I'll tell you, don't you ever go up against me because you will lose.'
"Q: And did you shake hands after that?
"A: Absolutely not.
"Q: So the demeanor of the meeting, was it not a pleasant event?
"A: It wasn't pleasant at all."
Aaron testified that he saw Jim Parsons in the World Gym facility "maybe twice" during the period from February 1998 through August 10, 1998. He never dealt with Jim Parsons while negotiating the sale of the gym to Jimbo or while negotiating the pro shop agreement or the personal-training agreement. Aaron testified that neither Jim Parsons nor Jimbo ever told him that he had done anything wrong other than the statements made to him on August 10, 1998.
After he was fired from World Gym and instructed never to return, Aaron purchased land in Shelby County on which he had a large facility built. Aaron had entered into the agreement to purchase this land on July 21, 1998more than two weeks before Jim Parsons asked him to leave World Gym.[9] At the time of the trial, Ron McNeeley was leasing the facility, and he was operating Power House Gym in the facility. Aaron continued to train his personal-fitness clients at Power House Gym, although he testified that the number of his clients had decreased. Aaron also continued to manage a stand-alone nutritional supplement shop he had opened while he was still working with World Gym. However, he testified that his business at that shop had suffered as a result of his termination from World Gym. Aaron acknowledged that Power House Gym competes with World Gym.

Testimony of Jimbo Parsons
In 1997, Jimbo Parsons, a high school teacher, joined World Gym as a member. Shortly after joining, Jimbo became interested in owning and operating a gym. With the assistance of a personal friend, Julie Kitchings, and a consultant, John Oei, Jimbo began to investigate the possibility of purchasing World Gym.
Jimbo and Oei entered into informal negotiations with Patrick Aaron. Jimbo testified that he never offered to purchase World Gym for a price of $2,000,000; he testified that his purchase offer was always $1,700,000. Jimbo admitted that he and Oei agreed to allow Aaron to stock the pro shop and to allow Aaron to train his fitness clients at World Gym at no charge to Aaron, but he denied that those offers were designed to compensate Aaron for any shortfall in the purchase price. Jimbo testified that those agreements were wholly separate transactions from the Sale Agreement.
Upon assuming ownership of World Gym, Jimbo hired Kitchings as the director of the facility;[10] he also retained Ron McNeeley, who had worked for Aaron, as the sales manager.
Patrick Aaron, who was to be present in the gym training his fitness clients and stocking the pro shop, agreed to serve as a consultant, free of charge, to Jimbo. However, the gym, under Jimbo's ownership, *941 experienced difficulties from the beginning.
Jimbo acknowledged that conflicts occurred between Kitchings and other members of the staff at World Gym. Jimbo admitted that World Gym eventually lost members because of Kitchings.
Jimbo admitted that Kitchings and Aaron also experienced some conflict. Although Aaron, Oei, Kitchings, and Jimbo had all worked well together before Jimbo purchased the gym, Aaron and Oei expressed their concern to Jimbo immediately after the closing regarding Kitchings's ability to serve as the director. Jimbo immediately relayed this information to Kitchings. Jimbo acknowledged that, whenever Aaron provided negative feedback to him concerning Kitchings, Jimbo would relay that information and its source to Kitchings. From the record, it appears that the more information Jimbo relayed to Kitchings, the more antagonistic her relationship with Aaron became.
Evidence was presented indicating that Kitchings also complained to Jimbo about Patrick Aaron. Specifically, Jimbo testified that, according to Kitchings, Aaron used foul language in front of gym members and threatened to "knock her head off." However, Jimbo acknowledged that he never witnessed any of this alleged behavior; he also acknowledged that no one but Kitchings ever complained to him about Aaron. Jimbo described Aaron's conduct as cordial and polite and as always providing accurate advice and guidance on how to run the gym in a better manner.
Jimbo also claimed to have learned information during this same period indicating that Aaron was violating his noncompetition agreement. In an undated memorandum, referred to at trial as the "golden-egg memo," Jimbo told his father:
"The other thing and hopefully best news of all, is that it appears Patrick [Aaron] is active in the consultation and/or means to run a new gym for a particular investor. Apparently he's already looked at a place behind Winn Dixie [grocery store] on Hwy 31 and a spot near Copeland's [restaurant] here on 280. The understanding is that on several occasions he's told people that it's O.K. for him to run a gym and that he just can't be an owner or investor. Obviously I'm mentioning any of this to no one. However, Julie knows all the details. It seems that there is an individual who knows both Patrick and Julie. The stroke of luck is that Patrick doesn't know that this individual offering this info knows both he [sic] and Julie. We're just being patient and continue to record any info aiding in building our arsenal."
(Emphasis original.)
Jimbo testified that Aaron telephoned Jim Parsons and asked if "being a landlord of a gym" would violate the noncompetition agreement.[11] According to Jimbo, Jim Parsons simply responded that Aaron should seek legal advice regarding the terms of his noncompetition agreement. Although the conversation with Aaron took place on a speakerphone and Jimbo heard the entire conversation, Jimbo did not respond to Aaron's question; only Jim Parsons responded. Jimbo testified that he *942 believed Aaron had breached his noncompetition agreement by planning to purchase real estate and lease it to a competing gym, although Jimbo admitted he had no direct knowledge that Aaron actually had such plans.
Jimbo also acknowledged that his father terminated Aaron's agreements with World Gym on August 10, 1998. Jimbo testified that, on that day, neither Parsons nor Jimbo informed Aaron that they considered any of his actions to be in violation of his noncompetition agreement or his personal-training agreement.
Jimbo acknowledged that his father did not work at the gym and that he had been in the gym only a handful of times between February 2 and August 10, but that he came to the gym to talk with Jimbo about business. Jimbo acknowledged that he had no control over his father; that he could not "boss" his father around; that he could not give him directions; and that he could not fire him. Jimbo also admitted that his father was unaware of what went on day-to-day at the gym. However, Jimbo also testified that his father interviewed other employees of the gym on different occasions.
On cross-examination, Aaron's counsel asked Jimbo if the reason he had wanted Aaron to leave World Gym was simply because Kitchings disliked Aaron. Aaron's counsel also asked Jimbo if he was looking for a means to avoid renewing the pro shop agreement with Aaron in order to retain all of the profits from the pro shop. Jimbo denied that the prospect of profits motivated him to terminate Aaron's pro shop agreement.[12] Jimbo testified:
"While we were having problems with his behavior, and as I stated yesterday, it wasit was so problematic, something had to be done, but I thought it would be so unbecoming, nasty, just a terrible process to go through to take action to getto have him exit the premises based on his behavior. That being said, as this fell into our laps [the alleged violation of the noncompetition agreement], we were not actively looking for it. And when this came about, this wasin my opinion this was such a clear-cut means forfor correcting the problem that we were having."
Jimbo testified that he ultimately had to fire Kitchings when he discovered that Aaron's assessment of her had been correct. Jimbo testified that he learned that "having [Kitchings] as a manager was not in World Gym's best interest," and that "if [he] had listened to [Aaron], the gym might have been better."

Testimony of Jim Parsons
Jim Parsons testified that he became involved with Jimbo's attempt to purchase World Gym when the financing at one lending institution did not materialize. Parsons assisted Jimbo in obtaining financing, and he attended the closing of the purchase transaction. However, Parsons acknowledged that he had not been involved in negotiating the purchase of World Gym. He was not a party to the Sale Agreement, the noncompetition agreement, the pro shop agreement, or the personal-training agreement. He was not present when Jimbo and Patrick Aaron signed the pro shop agreement or the personal-training agreement.
Parsons testified that in May 1998, McNeeley, Kitchings, and Jimbo met with him.[13] At this meeting, Jim Parsons informed *943 McNeeley that he would not be given an ownership interest in the gym, as Jimbo had promised him.
Jim Parsons testified that he heard, through personal trainers and staff members of World Gym, that Patrick Aaron had used "foul and abusive language" to a female employee of the gym, had made a physical threat against Kitchings, and was in the process of setting up a competing gym. Parsons testified that he considered those actions to be detrimental to World Gym and, thus, to be in direct violation of the personal-training agreement.
On August 10, 1998, Parsons, although he was neither an owner nor an employee of World Gym, met with Patrick Aaron in the office of World Gym and "excused Mr. Aaron from the premises." Parsons told Aaron "not to come back to the gym" and that he "no longer had the pro shop business." Parsons admitted that, at the time he fired Aaron, he believed Aaron had one month remaining under his pro shop agreement. Parsons claimed that he explained to Aaron all of the reasons for his termination.
"A: I told him that because of his acts of competition up the road, that that along with all of the turmoil that he was creating among our staff and our members, I could not continue. His language, his threats. Iand he never denied it.
"Q: Is that all you said to him, what you've just told us?
"A: Obviously, we had more conversation. No, I couldn't say that's all.
"Q: Is that all you can recall?
"A: I can recall a fair amount about that conduct. Yes, there's more that I can recall.
"Q: Well, tell me about it.
"A: In the converI hadI had been hearing that he was competing. We had been gathering our information. He never denied it. It was athe parting waswas quite amicable. We shook hands. And I remember thinking that it was almost as though I had done him a favor by dismissing him, because this was something that later proved exactly what he wanted us to do, was to dismiss him and thereby violate our agreement."
Although Jimbo was present for this meeting, Jim Parsons actually undertook to "fire" Aaron.
Jim Parsons also fired Ron McNeeley on August 10, 1998. Parsons admitted that he was not McNeeley's employer or his supervisor. Parsons testified that he heard that McNeeley "had lost his motivation." Parsons stated: "I asked him was that true, and he said yes.... And I said, well, then I accept that as your resignation. He said, fine." Jimbo was not present for this meeting.
Jim Parsons testified that he was "the agent" of World Gym. He testified that his job description was to "assist his son in whatever manner [he] could." However, he acknowledged that he was not paid for his services, that he had no job title, and that he was not involved in the day-to-day operations of the gym. Jim Parsons testified that during the period these events occurred he was present in the gym "several times."
Parsons acknowledged at trial that Jimbo had not done a respectable job of managing World Gym. As of October 30, 1998, Parsons purchased 90% of his son's interest in the corporation and changed the *944 corporation's name to Southoak, Inc. Jimbo returned to teaching, and Parsons took over the majority ownership and management of World Gym.
Parsons claimed that World Gym lost sales due to competition from Power House Gym, a competing gym at which Patrick Aaron trained his fitness clients and which operated out of a building owned by Aaron.

Testimony of Ron McNeeley
When Aaron owned World Gym, Ron McNeeley worked as its general manager. As the general manager of the gym, McNeeley was in charge of marketing and the sales staff, as well as supervising a staff of 30 employees who were responsible for the front desk, fitness and training, maintenance, and janitorial and day-care services. He testified that he worked approximately 10 hours per day. For his services, McNeeley received $2,500,[14] plus commissions on his sales of club memberships. McNeeley also received monthly bonuses if certain sales quotas were met.
When Aaron sold the gym to Jimbo, Jimbo kept McNeeley on to serve as the sales manager, and he hired Julie Kitchings as the gym manager. McNeeley testified that he agreed to stay on as the sales manager only because Jimbo promised him an immediate 5% ownership interest in the gym and, in two years, another 5% ownership interest. According to McNeeley, Jimbo also promised that every year thereafter on the date of the anniversary of his employment, McNeeley would receive an additional 1% ownership interest until he owned 15% of World Gym. McNeeley testified that, in February 1998, Jimbo announced to the employees and members of the gym that McNeeley was one of the "new owners."
McNeeley confronted Jimbo in March when he had taken no action to transfer any ownership interest in the gym to McNeeley. Jimbo then had minutes of a "special meeting [of the corporation]" drawn up, authorizing the issuance of 55 shares of the corporation's stock each to McNeeley and Kitchings. However, shortly after this document was drafted, Jim Parsons summoned McNeeley and Kitchings to a meeting. At this meeting, Parsons informed McNeeley and Kitchings that he was not going to honor the agreement to give them each 55 shares of the corporation's stock; although present at the meeting, Jimbo said nothing.
According to McNeeley, on August 10 Jimbo and Jim Parsons called McNeeley into the office. Parsons stated "Jimbo tells me that you're just having a hard time getting over the fact that you didn't get your ownership and that you're not motivated, and that we feel like we're going to take that as your resignation." McNeeley responded that he would not resign; however, August 10 was his last day to work at World Gym.

Testimony of John Oei
John Oei served as a consultant for Jimbo. Because Oei moved out of state shortly after Jimbo purchased World Gym, Oei's knowledge of this dispute is limited to the parties' negotiations and to the events that occurred during the first few weeks after Jimbo purchased the gym.
Oei testified that he and Jimbo began informal discussions with Patrick Aaron regarding the purchase of World Gym. Aaron initially mentioned $3,000,000, which Oei and Jimbo quickly rejected. Oei testified *945 that Aaron then informally mentioned $2,000,000, and Oei and Jimbo began investigating the books and accounts of World Gym.
However, after reviewing that figure with accountants and banks, "[we] determined that $1,700,000 would be a much better price for Jimbo.... And then we had a discussion with Patrick Aaron about reducing that price down to $1,700,000." Oei testified that Jimbo and he offered Aaron the pro shop arrangement, the personal-training agreement, and the free membership, "in what we were hoping would be a win-win situation." Oei agreed that those other agreements were incorporated into the transaction as a means for Aaron to recoup the $300,000 reduction in the purchase price.
Oei also testified that he advised Jimbo that he did not believe Kitchings was well suited to the position of general manager but that McNeeley was essential to the success of World Gym. However, despite this advice, Jimbo hired Kitchings as the general manager.
On cross-examination, the Parsonses' attorney questioned Oei, who was called as a witness by Aaron, as to why he would leave his job in Illinois for two days, allow Aaron to pay his travel and lodging expenses, and testify at trial against Jimbo without a subpoena, if, as Oei testified, he was merely concerned with Jimbo's best interest. The Parsonses' counsel asked Oei if he had wanted the director's position at World Gym for himself and whether he was bitter because Jimbo had hired Kitchings, rather than Oei, for that job.

Testimony of Michael Sperando
Michael Sperando, a certified public accountant, testified regarding World Gym's financial records. Using financial ledgers prepared by the Parsonses, Sperando concluded that World Gym lost over $100,000 in revenues during 1998. Sperando testified that World Gym's revenues decreased "most months" of 1998.

Issues Asserted on Appeal
On appeal, the Parsonses assert the following issues:
I. Whether the trial court committed reversible error by permitting Aaron's tortious-interference claim to go to the jury.
II. Whether the trial court committed reversible error by admitting parol evidence to vary the terms of the written contract between the corporation and Patrick Aaron.
III. Whether the compensatory-damages award for breach of contract is excessive and warrants a new trial.
IV. Whether the jury's award of compensatory damages for tortious interference is excessive.
V. Whether the trial court's remitted punitive-damages award of $60,000 on the tortious-interference claim is excessive.[15]
We conclude that the trial court improperly denied Jim Parsons's motion for a judgment as a matter of law on Aaron's tortious-interference claim; we reverse the judgment entered on the jury's verdict in favor of Aaron on his tortious-interference claim and render a judgment in favor of Jim Parsons. Because of our resolution of this issue, we need not address the challenge to the compensatory- and punitive-damages awards on that tortious-interference claim (Issues IV and V). We find no reversible error in the trial court's ruling regarding parol evidence. We reverse the *946 judgment entered for Aaron on his breach-of-contract claim and remand the cause to the trial court for a new trial on that claim.

Discussion
I. Whether the trial court committed reversible error by permitting Aaron's tortious-interference claim to go to the jury.
Jim Parsons argues that the trial court committed reversible error by submitting Aaron's claim of tortious interference to the jury because, he says: (a) Jim Parsons was not a third party or a "stranger" to the business relations between Aaron and Jimbo; (b) Aaron failed to prove that Jim Parsons intentionally interfered with Aaron's relationship with Jimbo or the corporation; (c) Aaron failed to prove a lack of justification for Parsons's interference; and (d) Aaron failed to prove any damages resulting from Parsons's interference. We agree that the trial court improperly submitted the tortious-interference claim to the jury. We reverse its judgment and render judgment for Jim Parsons on this issue.
This Court recently recognized that to establish tortious interference with contractual or business relations a plaintiff must prove:
"`1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference.'"
Ex parte Awtrey Realty Co., 827 So.2d 104, 108-109 (Ala.2001), quoting Soap Co. v. Ecolab, Inc., 646 So.2d 1366, 1371 (Ala. 1994).
Justification has been recognized both as an element to be proved by the plaintiff and as an affirmative defense to be pleaded and proved by the defendant. Compare Awtrey Realty, supra, and Pakruda v. Cross, 669 So.2d 907, 909 (Ala.Civ.App. 1995); BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 203 (Ala.2001). As we noted in BellSouth Mobility, "`it is illogical to continue to list an absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it.'" 814 So.2d at 212 n. 5, quoting Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296, 298 (Ala.1990).
We agree with the language quoted in BellSouth Mobility. We reiterate that justification for interference with contractual or business relations is an affirmative defense to be pleaded and proved by the defendant.
In addition to the elements recited above, this Court has also recognized:
"`After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a "third party," i.e., a "stranger" to the contract with which the defendant allegedly interfered.' Atlanta Market Ctr. Management Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998); see also Alcazar Amusement Co. v. Mudd & Colley Amusement Co., 204 Ala. 509, 86 So. 209 (1920). This is so, because `a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract.' Lolley v. Howell, 504 So.2d 253, 255 (Ala.1987).
"`One is not a stranger to the contract just because one is not a party to the contract....' McLane, 269 Ga. at 608, 503 S.E.2d at 282 (emphasis added [in BellSouth Mobility]). As we recently stated in Colonial Bank v. Patterson, 788 So.2d 134 (Ala.2000): `[W]hen tripartite *947 relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized.'"
BellSouth Mobility, 814 So.2d at 212. Thus, we examine these elements in light of the evidence included in the record.
Aaron established the existence of a contract or business relationship with Jimbo or the corporation. The parties admitted that the pro shop agreement and the personal-training agreement, as well as the lifetime gym membership, were in effect on August 10, 1998, when Patrick Aaron's agreements were terminated and he was forbidden to return to World Gym. Additionally, Jim Parsons admitted that he was aware of the existence of those agreements. Thus, the first and second elements of the tort of interference are not in dispute.
However, the evidence established that Jim Parsons undertook to act on behalf of the corporation in numerous ways. Parsons was involved in obtaining the financing for the purchase of the gym, and Jimbo testified that his father came to the gym on more than one occasion to talk with him about the business. Jimbo also testified that Parsons interviewed World Gym employees on other occasions. Additionally, Jimbo instructed Patrick Aaron and other employees to contact Jim Parsons with certain legal and business questions.
However, it is significant that, as early as March 1998, Jim Parsons began making what appear to be unilateral business decisions on behalf of the corporation. Although those decisions may have contradicted Jimbo's earlier directives, Jimbo knew of those decisions and allowed those decisions to stand. Jimbo was even present when Parsons made the majority of the decisions at issue in these actions. Accordingly, Jimbo, the sole shareholder and sole officer of the corporation, ratified those actions.
From this evidence, we conclude that Jim Parsons was acting as an agent for the corporation and/or as an agent for Jimbo and, thus, that Jim Parsons was not a third party to the business relations of Jimbo, the corporation, and Aaron. We conclude that, as a matter of law, Jim Parsons cannot be liable for tortious interference with the business or contractual relations between Jimbo, the corporation, and Aaron. We reverse the judgment entered on the jury's verdict and render a judgment in favor of Jim Parsons.
II. Whether the trial court committed reversible error by admitting parol evidence to vary the terms of the written contract between the corporation and Patrick Aaron.
The corporation and Jimbo assert on appeal that the trial court erred in allowing Aaron to testify about negotiations that occurred before the execution of the Sale Agreement and regarding the $2,000,000 asking price. The Parsonses argue that the trial court erred by allowing this testimony because it was offered only to vary the terms of the Sale Agreement, because the Sale Agreement contained an integration clause and because the Sale Agreement was unambiguous. Further, because the jury awarded Aaron exactly $300,000 ($193,000 in compensatory damages and $107,000 in punitive damages) the difference between the $2,000,000 and the amount reflected in the Sale Agreement as the purchase price for World Gymthe Parsonses argue that the impermissible parol evidence prejudiced their case. We reject that argument, finding no error in the trial court's evidentiary ruling.
First, the evidence complained of could have been offered for purposes other than *948 to vary the terms of the Sale Agreement, which the Parsonses contend is a fully integrated writing. Marriott Int'l, Inc. v. deCelle, 722 So.2d 760 (Ala.1998) (general rule is that if a written contract exists, the rights of the parties are controlled by that contract and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms; however, if the contract is ambiguous, parol or extrinsic evidence will be allowed to clarify the contract). Aaron presented the pro shop agreement and the personal-training agreement as the agreements with which Jim Parsons had wrongfully interfered and which had been breached. However, if those agreements were deemed to be ambiguous, then the evidence relating to the negotiations and how the pro shop agreement and the personal-training agreement came about could have been introduced for the purpose of explaining ambiguities surrounding those documents rather than for the sole purpose of varying the terms of the Sale Agreement. See Anderson Bros. Chrysler Plymouth Dodge, Inc. v. Hadley, 720 So.2d 895 (Ala.1998) (if a written agreement is ambiguous, then parol evidence is admissible to clarify its terms).
In testifying as to the value of those agreements, Patrick Aaron explained why he entered into those agreements and what he expected to earn under them. Aaron's testimony contradicted Jimbo's explanation of why the parties entered into those agreements. This conflict in the testimony established that the parties had different understandings of how they arrived at the $1,700,000 purchase price reflected in the Sale Agreement and different understandings of why they entered into the pro shop agreement and the personal-training agreement. In explaining those discrepancies, Aaron and Oei testified that the pro shop and personal-training agreements were negotiated as part of the purchase transaction; Jimbo testified that they were negotiated as separate transactions. From a reading of the record, it is clear that the trial court could have concluded that whether the Sale Agreement, the pro shop agreement, and the personal-training agreement were intended to be construed together or separately was ambiguous. This ambiguity justified the trial court's evidentiary ruling on parol evidence.
Additionally, the record is unclear as to the dates on which, and the order in which, the agreements were executed. The Sale Agreement bears a typed-in date of January 30, 1998. Jimbo testified that, although the pro shop agreement bears the date of January 28, 1998before the execution of the Sale Agreementthe parties actually executed the pro shop agreement several days after they executed the Sale Agreement. Moreover, the personal-training agreement was unexecuted and undated, but the parties honored it. Thus, Jimbo's testimony, as well as other portions of the record, revealed some ambiguities involving when each of the agreements was executed. Those ambiguities justified the trial court's ruling on parol evidence. See Crimson Indus., Inc. v. Kirkland, 736 So.2d 597 (Ala.1999) (because the parol evidence rule applies only to evidence of prior and contemporaneous negotiations, it does not exclude evidence of negotiations that took place after the written agreement was made); Stephens v. Stephens, 680 So.2d 329 (Ala.Civ.App.1996) (the parol evidence rule excludes only evidence of prior or contemporaneous agreements and has no application to subsequent agreements). For these reasons, we find no reversible error in the trial court's evidentiary ruling.
III. Whether the compensatory-damages award for breach of contract is excessive and warrants a new trial.
The Parsonses allege that the $92,000 awarded as compensatory damages *949 on Aaron's breach-of-contract claim is excessive and warrants a new trial. We agree.
Aaron claimed that the Parsonses had breached his pro shop agreement, his personal-training agreement, and his lifetime-membership agreement. Aaron testified that his profits from the pro shop sales were as much as $3,000 per month. Jim Parsons admitted that, at the time he terminated Aaron's pro shop agreement, at least one month remained under that agreement. Although the parties disputed whether that agreement would have terminated at the end of that month or whether it would have been automatically renewed for another six-month term, the trial court instructed the jury that the term of the pro shop agreement was only six months. Thus, the most the jury could have awarded for the breach of this agreement was $3,000.
The evidence also established that Aaron's personal-training agreement had been breached. He testified that, as a result, he was forced to join another gym in order to train his clients and that he lost clients who found the location of the new gym inconvenient. However, Aaron presented no evidence as to the financial losses associated with the breach of that agreement.
Aaron also lost the benefit of his free lifetime family membership at World Gym. Although this agreement clearly had some value to Aaron, no evidence of that value was presented, so we do not know, and the jury could not have known, what value to attribute to the breach of this agreement.
We recognize that some evidence was presented indicating that the pro shop agreement, the personal-training agreement, and the lifetime membership at the gym were intended to supplement the Sale Agreement in the amount of $300,000. This testimony could have been construed by the jury as evidence of Aaron's damages resulting from the breach of contract. However, Aaron presented no evidence to establish that the anticipated value of these agreements to him was $300,000.
"`"It is well settled that damages awarded for breach of contract should return the injured party to the position he would have been in had the contract been fully performed."'" Mannington Wood Floors, Inc. v. Port Epes Transp., Inc., 669 So.2d 817, 822 (Ala.1995) (quoting Med Plus Props. v. Colcock Constr. Group, Inc., 628 So.2d 370, 375 (Ala.1993), quoting in turn Cobbs v. Fred Burgos Constr. Co., 477 So.2d 335, 338 (Ala.1985)). The Mannington Wood Floors Court also recognized:
"In computing damages for breach of contract, a jury need not achieve `mathematical precision.' Indeed, `"the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount."' Thus, a `"plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss."'"
669 So.2d at 822 (citations omitted).
However, damages may not be awarded where they are remote or speculative. A jury must have some reasonable basis for the amount of its award. "`Where, as here, the jury verdict cannot be justified upon any reasonable hypothesis presented by the evidence, it ought to be set aside upon proper proceedings as being the result of compromise or mistake....'" Ferguson v. Cadle Co., 816 So.2d 473, 476 (Ala.2001), quoting Donavan v. Fandrich, 265 Ala. 439, 440, 92 So.2d 1, 2 (1957).
Although we find sufficient evidence in the record from which the jury could have determined that the contracts were breached and that Aaron was damaged as *950 a result of that breach, we find insufficient evidence in the record from which the jury properly could have determined the amount of damages to award on Aaron's breach-of-contract claim to exceed $3,000. We, therefore, reverse the judgment entered on Aaron's breach-of-contract claim and remand this case for a new trial of that claim.

Conclusion
The Parsonses timely filed their notices of appeal, and we deny Aaron's motion to dismiss the Parsonses' notice of appeal in case no. 1002086. We reverse the judgment entered on the tortious-interference claim and render judgment in favor of Jim Parsons on that claim. We find no reversible error regarding the trial court's ruling on parol evidence; we affirm that ruling. We reverse the judgment entered on the breach-of-contract claim and remand it to the trial court for a new trial. We dismiss as moot Aaron's cross-appeal from the trial court's order of remittitur.
1002086 and 1002087MOTION TO DISMISS APPEAL DENIED; AFFIRMED IN PART; REVERSED IN PART; JUDGMENT RENDERED IN PART; REMANDED.
HOUSTON, BROWN and HARWOOD, JJ., concur.
SEE and LYONS, JJ., concur specially in part and concur in the result in part.
JOHNSTONE and WOODALL, JJ., concur in part and concur in the result in part.
MOORE, C.J., concurs in part and dissents in part.
1010105CROSS-APPEAL DISMISSED AS MOOT.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., dissents.
LYONS, Justice (concurring specially in part and concurring in the result in part).
In case no. 1002086 and case no. 1002087, I concur in reversing the trial court's judgment and rendering a judgment for Jim Parsons on the tortious-interference claim. I express no opinion as to the admissibility of parol evidence because I consider a ruling on that issue unnecessary. I also concur in reversing the trial court's judgment on the breach-of-contract claim and remanding the case for a new trial on that issue.
In case no. 1010105, I concur.
SEE, J., concurs.
JOHNSTONE, Justice (concurring in part and concurring in the result in part).
I concur in the holding that the Parsonses' appeal was timely. The operation of Rule 59.1, Ala. R. Civ. P., supplanted the interlocutory July 5 conditional denial of the Parsonses' Rule 59 motion with an absolute denial on the July 6 deadline for ruling. The Parsonses filed their appeal on the forty-second day thereafter.
I also concur in the conclusion that Aaron's cross-appeal is moot. One of the reasons is that the Parsonses' Rule 59 motion for, amidst other relief, a remittitur was absolutely denied by operation of law on July 6, as already mentioned. The subsequent filings by the parties and ruling by the trial court on the topic of remittitur were nullities.
I concur in the result of reversing the judgment of the trial court in favor of Aaron on the tortious interference claim and rendering a judgment in favor of Jim Parsons on that claim. Jim Parsons's evidence *951 that he was the agent of his son Jimbo and the corporation was not contradicted by substantial evidence.
I concur in the result of reversing the judgment in favor of Aaron on the breach of contract claim. I agree that Aaron did not prove more than $3,000 in damages for breach of contract. I also respectfully submit, however, contrary to the rationale in the main opinion, that the trial court erred to reversal in allowing Aaron to introduce evidence that the parties orally agreed on a $2,000,000 price for the gym before they entered the written contract fixing the price at $1,700,000. Neither Aaron nor the main opinion identifies any ambiguity in that contract itself or any of the other written agreements themselves. Contradictions in the testimony of witnesses do not constitute ambiguities in contractsmuch less any ambiguity that would justify the admission of testimony to a $300,000 difference in the price of the gym. This testimony apparently irrationally influenced the jury in that it awarded Aaron a total of exactly $300,000 apportioned among the various claims and combinations of defendants.
WOODALL, Justice (concurring in part and concurring in the result in part).
In case no. 1002086 and case no. 1002087, I concur in the result. In case no. 1010105, I concur.
MOORE, Chief Justice (concurring in part and dissenting in part).
I respectfully dissent from the main opinion insofar as it reverses the judgment entered on the jury's verdict and renders a judgment in favor of James T. Parsons as to the tortious-interference claim. I believe the main opinion errs in deciding that Parsons was acting as an agent for James C. Parsons, Inc., or James C. Parsons ("Jimbo"), and, thereby deciding the tortious-interference claim in Parsons's favor. "As this Court has held, `the existence and scope of an agency relationship are questions of fact to be determined by the jury.'" Lee v. YES of Russellville, Inc., 784 So.2d 1022, 1028 (Ala.2000), quoting Standard Plan, Inc. v. Tucker, 582 So.2d 1024, 1029 (Ala.1991) (emphasis added). See also Thrash v. Credit Acceptance Corp., 821 So.2d 968, 972 (Ala.2001); Tyson Foods, Inc. v. Stevens, 783 So.2d 804, 808 (Ala.2000). Therefore, I also dissent from the dismissal of the cross-appeal.
I concur with the remainder of the main opinion.
NOTES
[1] Although the complaint filed in this action lists the name of the corporation as James C. Parsons, Inc., and the parties referred to the corporation as James C. Parsons, Inc., the record reflects that the actual name of the corporation was "JCP, Inc." In this opinion we refer to the corporate plaintiff as did the complaint and the partiesJames C. Parsons, Inc.
[2] The Parsonses do not appeal from the judgment entered on Aaron's conversion claim.
[3] Before Aaron's complaint was filed, Jim Parsons had acquired 90% of the shares of the corporation and had changed the name of the corporation to Southoak, Inc. Accordingly, in his amended complaint, Aaron alleged breach-of-contract and conversion claims against Jimbo, Jim Parsons, and Southoak, Inc. Aaron alleged tortious interference only against Jim Parsons.
[4] We note that although Aaron's motion to dismiss was filed in case no. 1002086, the same arguments apply to case no. 1002087.
[5] Pursuant to Rule 59.1, Ala. R. Civ. P., the trial court may extend the time in which motions may remain pending, so long as it has the express consent of all parties. The record reflects that all parties expressly consented to an extension until July 6, 2001, unless the trial court ruled upon the motions before that date. No further extensions are reflected in the record; thus, as of July 6, all posttrial motions in this case that had not been ruled upon by the trial court were deemed denied as a matter of law.
[6] John Oei acted as a consultant and adviser to Jimbo while Jimbo investigated and negotiated the purchase from Aaron of World Gym. His involvement in the transaction and his testimony at trial is discussed in more detail later in this opinion.
[7] Patrick Aaron's mother, Patricia Cottrell, was the majority shareholder in that corporation.
[8] Jimbo, however, returned to the gym after this conversation with Aaron and immediately told Kitchings what Aaron had said.
[9] Although not completely clear from the record, it appears that Aaron did not complete this transaction until after Parsons terminated his agreements with World Gym.
[10] The record sometimes refers to Kitchings as the director of the gym and sometimes as the general manager of the gym. We assume that these terms are interchangeable.
[11] The jury also heard evidence indicating that an oral modification was made to the Sale Agreement and the noncompetition agreement. The parties originally interpreted those agreements to prohibit Patrick Aaron from even joining another gym. However, Jim Parsons testified that "that was not our intent to restrict [Aaron]" and when Aaron asked for the right to train clients at other gyms "we told him that it was no problem at all."
[12] As part of his response to this line of questioning, Jimbo stated that he believed the pro shop agreement did not automatically renew but that it was to be "reviewed for renewal" at the end of six months.
[13] The record contains conflicting accounts of where this meeting took place. One witness testified that the meeting took place at Parsons's home; another witness testified that the meeting took place at Shoal Creek Country Club.
[14] Although the record is unclear, we assume this meant McNeeley was paid $2,500 per month.
[15] In their cross-appeal, Patrick Aaron and Pat & Pat, Inc., appeal from the trial court's order remitting the punitive-damages award. Based on our resolution of the Parsonses' appeals, this issue is moot.