MURDOCK, Justice
(concurring in the result in part and dissenting in part).
A. Reinstating the Panel’s Findings of Violations
Although I believe we should reinstate the panel’s findings as to what rules Hal-lett violated, I do not agree with all the reasoning used by the panel or by the main opinion to reach this result.
First, I am concerned that a statement in the panel’s decision could be construed as endorsing a “reasonableness” standard for the evaluation of allegedly excessive attorney fees. Second, I am concerned about the conflation of the concept of “clearly excessive fees” and the separate and different concept of “unearned fees,” a concept that relates to the prohibition of “nonrefundable retainers.” These concerns go to the risk of improper outcomes in future cases, even if not in this case. Moreover, they ultimately implicate the right of a lawyer and his or her client to contract, particularly as to fixed or “flat” fee arrangements.
*1143 1. “Reasonableness” v. “clear excessiveness” of fees
In a statement partially quoted in the main opinion, the panel stated as follows: “Even a flat or fixed fee must be reasonable, and must be returnable to the extent of any un-earned portion.” I see no rule in the Alabama Rules of Professional Conduct requiring that fees to which two private parties voluntarily agree be “reasonable.” Wisely, in my view, the drafters of our Rules of Professional Conduct did not see fit to attempt to involve the Alabama Bar Association in policing the “reasonableness” of fees charged by lawyers. What the drafters did choose to prohibit is what the rules refer to as “clearly excessive fees.”
Rule 1.5(a) is the rule the drafters wrote to prohibit a “clearly excessive fee.” It contains a plain prohibition of such a fee and a list of factors to be considered by the Bar in determining what is and what is not a “clearly excessive fee.” Insofar as the amount of Hallett’s fee is concerned, Rule 1.5(a) is the rule Hallett was charged with violating. I agree that he violated this rule.
2. Conflation of the concepts of “clearly excessive fees, ” “unearned fees, ” and “nonrefundable retainers ”
“Clearly excessive fees” and “nonrefundable retainers” are two separate and different concepts. They are governed by two different rules. Hallett was charged with violating only one of these rules, and not the other. Despite how he attempted to defend his actions at the hearing before the panel, when all was said and done, the fact is that Hallett violated only one of these rules.
The main opinion appears to accept the injection of the concepts of “unearned fees” and “nonrefundable retainers” into what I submit should be a discussion limited to the issue whether the amount of Hallett’s fee was “clearly excessive” under the criteria prescribed by Rule 1.5(a). The above-referenced partial quotation from the panel opinion and the ensuing analysis of the main opinion read as follows:
“[T]he Panel observed: ‘Even a flat or fixed fee ... must be returnable to the extent of any un-earned portion. [Hal-lett] testified that he regarded the entire fee as being fully earned upon execution of the contract, and that no part of it was refundable or subject to cancellation.’ The panel’s observation is correct. The Bar argues, and we agree, that Hallett’s contention is tantamount to defending charging a nonrefundable retainer, which is forbidden in Alabama. It is well settled that nonrefundable retainers are prohibited. See Taylor v. Alabama State Bar, 587 So.2d 1205 (Ala.1991); Rule 1.16(d), Ala. R. Prof. Cond. (‘Upon termination of representation, a lawyer shall ... refund[ ] any advance payment of fee that has not been earned.’); J. Anthony McLain, Opinions of General Counsel, ‘Lawyers’ Trust Account Obligations with Regard to Retainers and Set Fees,’ 70 Ala. Law. 65, 66 (January 2009) (‘all retainers and fees are refundable to the extent that they have not yet been earned’).”
26 So.3d at 1137 (emphasis omitted).
“Unearned fees” and “nonrefundable retainers” are the subject of Rule 1.16(d). Hallett was not charged with violating this rule. Ultimately, he did not violate it. Rule 1.16(d) provides: “Upon termination of representation, a lawyer shall ... re-fundí ] any advance payment of fee that has not been earned.” Thus, Hallett was incorrect in testifying that the fee in question was earned as soon as Mrs. Earheart executed the retainer agreement. As a factual matter, however, the fee in question ivas earned. It may have been (as discussed below) a “clearly excessive fee” in relation to the quantity and quality of *1144 work and the results achieved, thus running afoul of Rule 1.5(a), but it was a fee that was “earned” in the sense contemplated by Rule 1.16(d).
Specifically, the contract into which Hal-lett and Mrs. Earheart voluntarily entered provided that, in return for representing Mrs. Earheart through the trial-court proceedings to a final judgment, Hallett would receive a fixed, or “flat,” fee of $100,000. Hallett represented Mrs. Earheart through the trial-court proceedings to a final judgment. As contemplated by the authorities cited by the main opinion, at no time was Hallett discharged or replaced by another attorney; nor did he, for any other reason, fail to complete the representation of Mrs. Earheart through trial and a final judgment. He may not have done it well, but unlike attorneys in cases such as Taylor v. Alabama State Bar, 587 So.2d 1205 (Ala.1991), cited in the main opinion, Hallett completed the representation for which he was hired. See 587 So.2d at 1206 (explaining that there was no evidence indicating that an attorney had earned any of his fixed fee between the time it was given to him and the time he was asked to withdraw from the case). See also J. Anthony McLain, Opinions of General Counsel, “Lawyers’ Trust Account Obligations with Regard to Retainers and Set Fees,” 70 Ala. Law. 65 (January 2009).[10]
Again, Hallett was charged with violating Rule 1.5(a). The conduct prohibited by Rule 1.5(a) and the criteria for determining whether a lawyer engaged in that conduct are clearly set out in that rule itself. Hallett clearly violated that rule. I see no need to go outside the criteria provided by Rule 1.5(a), and especially no need to inject into the discussion the different concepts of “nonrefundable retainers” and “unearned fees” found in Rule 1.16(d) in order to decide if the panel’s decision that Hallett violated Rule 1.5(a) is sustainable. As stated at the outset, in conflating these concepts we run the risk of achieving incorrect results in future cases and, even more problematically, of impinging on the right of private parties to enter into contracts governing the exchange of legal services for agreed-upon fees.[11]
B. The Amount of the Penalty
I. Was the penalty imposed by the panel too much?
Part II.B of the main opinion, titled “Case No. 1071486,” is devoted to the issue whether the discipline imposed by the panel for the four rules violations found by the panel was too much. That issue, however, has not been presented by Hal-lett to this Court.
*1145 Of the four rules violations found by the panel, the Board upheld only one of them. As the opening sentence of Part II .B states, “The Board upheld the panel’s finding that Hallett was guilty of violating Rule 8.4(g), and Hallett cross-appeals as to the punishment the Board imposed for that violation.” 26 So.3d at 1139. In other words, the Bar filed an appeal, case no. 1071419, challenging the Board’s decision that Hallett had committed only one rule violation, instead of the four rules violations found by the panel. Hallett, as the appellee in that case, defends the Board’s decision that he committed only one rule violation. In addition, Hallett has filed a cross-appeal, case no. 1071486, in which he challenges as excessive the discipline imposed by the Board for that single rule violation.
Hallett has provided this Court with no argument by way of a conditional cross-appeal [12] or otherwise to the effect that, if he loses in the appeal, and this Court reverses the Board’s decision and reinstates the panel’s decision, including its conviction and punishment of Hallett for four rules violations rather than only one, the discipline imposed in the panel’s decision for those four violations should be reduced. Again, Hallett makes an argument relating only to what he considers to be the unreasonableness of the discipline imposed by the Board for the single violation of Rule 8.4(g). He makes no argument challenging the degree of the punishment ordered by the panel in the event that he is to be punished for all four violations found by the panel. His argument presumes that the only violation for which a punishment is needed is his violation of Rule 8.4(g), a presumption that is not valid in light of this Court’s decision today in the Bar’s appeal.
Thus, Hallett has provided this Court with no basis for disturbing the discipline imposed by the panel now that we are reinstating the panel’s finding of four rules violations and now that a discipline is needed for those four violations rather than only the one upheld by the Board. Logically, there is no need for this Court to even take up this issue unless we would be willing to do so on the basis of an argument that we would craft for Hallett and authorities that we would provide on his behalf. See Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994) (holding that it is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party). I therefore do not find warranted the discussion in the main opinion as to whether the punishment imposed by the panel was too much, unless there is a sufficient need for us to take up that issue ex mero motu. I see no such need.
2. Was the punishment imposed by the panel not enough?
I do, however, see a need to take up ex mero motu the different issue whether the *1146 discipline imposed by the panel was not enough.
The panel found as follows:
“Mr. Hallett testified ... that he essentially devoted his entire professional time to this single matter from September 18 through October 17. However, the testimony of Brandon Lee, a former secretary in [Hallett’s] office, was to the effect that the day-to-day business of other matters continued to be handled by [Hallett] as had been customary, that Bowman worked on the Earheart files (obtained from opposing counsel) only for the week before trial, not for the month from September 18 to October 17, and that Bowman was also conducting other business (for which time was recorded and billed); she testified that Mr. Hallett maintáined his usual schedule, approximately 9-5, including court appearances in other matters.
“It is clear that no discovery depositions were initiated or taken by [Hal-lett],5 no witnesses were interviewed, and no accounting expert engaged. Except for the amendment adding the civil tort claim and the motion to disqualify, no pleadings were filed. On the day before trial, some 14 subpoenas were issued, only a few of which were served, and, except for witnesses on whom no subpoena was necessary ie.g., Mrs. Earheart’s children), none of those witnesses testified, including the alleged paramour of Mr. Earheart. Mr. Hallett sought to explain the failure to call or interview the alleged paramour first on the basis that his opposing counsel had ‘hidden’ the witness (which was hotly denied by such counsel), then on the basis that she lived behind a gated entrance, and service of process would have been impossible; the latter excuse also proved to be inaccurate.
“5 The deposition of Mr. Hallett’s client was ‘taken by opposing counsel,’ but Mr. Hallett did not attend, nor did he engage in preparing his client for her deposition.
“The panel, having heard the testimony of [Hallett] as to the Bowman invoice and having examined it, finds that many of the entries contained in it are clearly fraudulent, and even where not clearly a fraud, are excessive and show evidence of having been manufactured after the fact, and after a dispute had arisen between [Hallett] and Mrs. Earheart, as part of which the client demanded an invoice.6 The invoice sought payment of $11,094.72 for Mr. Bowman’s services, and an additional $8198.03 for largely unspecified and undocumented expenses. On January 11, 2001, [Hallett] also sent a separate invoice for a $100,000 fee, $4,000 in interest from September 15, 2000, and $6,942.78 for expenses. Those expenses were only (collectively) identified as: ‘Research costs with Westlaw; copying costs; deposition costs; discovery costs; postage costs;’ [sic]. There was no identification of the depositions (other than the single deposition taken by opposing counsel, there were none), discovery events (none were identified), or Westlaw research (none was identified). The January 11 invoice expressly did not include the ‘paralegal fees’ which were to be ‘billed seperately [sic] per retainer agreement ... ’
“6 A few examples suffice: there is an entry for October 18, 2000, for eight hours, allegedly for Mr. Bowman’s attendance in court assisting [Hallett]. However, the trial had been concluded by midday on October 17, and this identical entry and charge appears for October 13 (10 hours), October 16 (10 hours) and October 17 (8 hours), the latter for a half-day of court; October 17 further includes *1147 4.25 hours of ‘preparation’ for an already-concluded hearing. October 16 includes time asking for information as to whether the judge had signed the divorce, before the trial was concluded. Fifteen hours were recorded to review one set of handwritten notes prepared by [Mrs. Earheart] as an outline. On October 12 (the day before trial), fourteen subpoenas were recorded as being prepared, at one billable hour each. Few of those were served, and even fewer were called as witnesses. Except for Mrs. Earh-eart’s children, none appear to have even been interviewed. One and one-half hours are charged for recording the Promissory Note/lien against Mr. Hallett’s client’s property.”
(Emphasis added; citations to the record omitted.)
Regarding the relationship of the fee charged by Hallett to the amount of work he actually put into preparing for trial, the panel states:
“As set out in the background facts, the total fee (exclusive of undocumented expenses) charged for the thirty days of employment through trial (and the small activity thereafter) totaled over $117,000, coupled with more than $13,000 of expenses, only approximately $2,920.00 of which was itemized. Mr. Hallett testified that his customary hourly charge would have been at most $200.00 per hour, so that, even crediting the testimony as to more than three hundred hours in thirty days, a resulting fee would have been at most $75,000.
... The factors under Rule 1.5(a)(l)-(9) were, for the most part not addressed by [Hallett] in support of the fee charged.
[[Image here]]
“The credible evidence does not support a finding of 300-400 hours of work devoted to this single matter in one month, nor anything approaching such a figure. The issues in the divorce, while unpleasant and contentious, were in no way unique or unprecedented; nor is the evidence of preclusion of other employment persuasive. The hilling by Mr. Hallett’s office for the paralegal time of Mr. Bowman is transparently false and overstated. The failure to even credit Mrs. Earheart with the $2100 portion of the $5000 awarded by the Court and paid by Mr. Earheart was not explained or justified; nor was the accrual of a high interest charge, from a date prior to the contract, on a fee which plainly could not possibly have been paid on demand, as its terms provide, justified.”
(Emphasis added; footnotes omitted.)
Despite the fact that Mr. Earheart had a net worth of millions of dollars and made over $500,000 per year, the panel found the results achieved for Mrs. Earheart to be “problematic”:
“The results of the divorce proceedings were problematic for Mrs. Earh-eart, resulting in an order granting her two pieces of real estate with an aggregate net value of approximately $600,000 (of which Mrs. Earheart already had been a half-owner before the divorce), 25% of Mr. Earheart’s retirement account (the value of which was never established, but which was later liquidated by settlement for approximately $25,000), child support as set by the domestic relations guidelines,7 and primary custody of the children. That order reserved a determination of alimony, but none was ever awarded, and ordered the husband to pay $5,000 toward his wife’s attorney’s fees.
“7 The evidence was without dispute that Mr. Earheart’s earnings far exceeded the guideline cap, but no *1148 application for an award exceeding the guidelines was made.”
Finally, the panel adds: “[T]he Panel is satisfied that [Hallett] has not been fully candid and truthful in his testimony or in his characterization of the events and documents before the Panel.”
The main opinion describes the fact that, some time after the trial in the divorce proceeding, Mrs. Earheart was forced for economic reasons to sell one of the parcels of land she had been awarded in the divorce and how Hallett extracted $110,942.78 from the closing proceeds. That sale came after a meeting between Hallett and Mrs. Earheart as described in the following colloquy:
“Q. [By counsel for the Bar:] What did he say to you about the divorce and the decision?
“A. [By Mrs. Earheart:] He told me titat he had made me a millionaire[13] and that what else did I want. And he was really harsh speaking with me. And I said: “Well, what are my options here?’ And he said: ‘Well, you can appeal it.’ And I was dissatisfied with the divorce.
[[Image here]]
“Q. What did you tell him?
“A. Well, I told him that I was going to be destitute very shortly after the divorce was rendered. And—
“Q. What did you mean by that?
“A. Well, I was unemployed. I had got no alimony, fifteen hundred dollars a month child support for two children, a house note of four thousand two dollars a month, [and] a vehicle note for seven fifty-six a month. So I was going to be shortly in trouble. And Mr. Hallett stated that I needed to sell my assets.
“Q. And had you planned on doing that?
“A. No.”
(Emphasis added.)
Hallett’s conduct in this case is the type of conduct that diminishes the reputation of the legal profession. Further, the $60,000 fee that remains after the panel-ordered restitution of $40,000 would correlate to Hallett’s working on Mrs. Earh-eart’s case for 10 hours a day every day, including weekends, for 30 straight days at a rate of $200 per hour.[14] It is clear that Hallett did not work anywhere near this much on Mrs. Earheart’s case. In addition, Hallett has received the additional $11,000 in at least partially fraudulent charges he caused to be added to the “HUD” closing statement as a precondition to Mrs. Earheart’s being able to close the above-described property sale.
Based on this Court’s inherent authority to oversee the administration of the judicial system and the discipline of lawyers admitted to practice before the Alabama courts, see Ex parte Case, 925 So.2d 956, 962-63 (Ala.2005) (“This Court has the inherent authority to admit lawyers to the practice of law, ... to inquire into matters of any disciplinary proceeding, and to take any action it sees fit in disciplinary matters.”), and because the restitution ordered by the panel is “manifestly ... insufficient in relation to the needs and protection of the public, the profession, or the administration of justice,” see Rule 5.1(d), *1149 Ala. R. Disc. P.,[15] I would remand this case to the panel for the entry of an order increasing the amount of restitution to be paid by Hallett to Mrs. Earheart up to, but not exceeding, an amount that would leave Hallett with sufficient funds to fairly compensate Morrow for his efforts in representing Mrs. Earheart before Hallett assumed that responsibility and compensating Hallett for reasonable out-of-pocket expenses he actually incurred.
C. Conclusion
Based on the foregoing, I concur in the result reached by the main opinion insofar as it reinstates the panel’s decision finding that Hallett committed four violations of the Alabama Rules of Professional Conduct. I dissent insofar as the main opinion reinstates the punishment imposed by that decision.

. This citation is to an opinion of the general counsel of the Alabama State Bar published in The Alabama Lawyer in which the general counsel explains that
“the overriding principle of [Formal Opinion] RO 1992-17 and [Formal Opinion] RO 1993-21 is that a non-refundable fee would impinge on the right of the client to change lawyers at any time. Allowing an attorney to keep a fee, regardless of whether any service has been performed for the client, would certainly restrict the ability of a client to terminate the attorney and seek new counsel. In reaching this conclusion, the Commission also made clear that the rule applied to all arrangements where fees are paid in advance of legal services being rendered. As such, all retainers and fees are refundable to the extent that they have not yet been earned.”
70 Ala. Law. at 65-66.

. As noted in Part A.l above, this conflation is articulated with reference to a “reasonable fee” standard rather than simply the "clearly excessive” standard prescribed in Rule 1.5(a). To that extent, I also am concerned that it could put us on a “slope” toward the use of the non-rule-based concept of the "reasonableness” of a fee as a measure for what will be deemed "unearned” and therefore what "must be returnable.”

. See, e.g., Parsons v. Aaron, 849 So.2d 932, 935 (Ala.2002) (explaining that the appellee had "filed a conditional cross-appeal, seeking reinstatement of the full punitive-damages award in the event the [appellant’s] appeals were not dismissed as untimely”); First Props., L.L.C. v. Bennett, 959 So.2d 653, 657 (Ala.Civ.App.2006) ("Because we have concluded that the judgment is due to be reversed as a result of the appeal, the condition specified in the [appellee’s] conditional cross-appeal has occurred, and that cross-appeal is ripe for review.”); Bess v. Waffle House, Inc., 824 So.2d 783, 787 (Ala.Civ.App.2001) ("Waffle House filed a cross-appeal, in which it did not challenge any portion of the trial court's judgment. Instead, Waffle House sought review of the trial court’s exclusion of the deposition testimony of a psychologist, Dr. Robert Barth, in the event that this court reversed the trial court’s judgment. Such a cross-appeal is known as a conditional cross-appeal and is considered to be moot in the event that the trial court’s judgment is affirmed.").

. The panel's findings obviously conflict with Hallett's assertion that he made Mrs. Earh-eart a millionaire.

. Even if 25% of this amount is allocated to Morrow, Hallett would still be paid at the rate of $150 per hour for a theoretical 300 hours, plus the $11,000 in at least partially fraudulent expenses extracted by Hallett from Mrs. Earheart at her real-estate closing.

. Rule 5.1, Ala. R. Disc. P., establishing the Board of Disciplinary Appeals and governing its operation, was rescinded by an order of this Court effective October 6, 2008.